**United States District Court**
For the Northern District of California

1
2
3
4 **E-FILED on** ___1/11/08___
5
6
7
8 IN THE UNITED STATES DISTRICT COURT
9 FOR THE NORTHERN DISTRICT OF CALIFORNIA
10 SAN JOSE DIVISION
11

12 In re FINISAR CORP. DERIVATIVE LITIGATION
13

14 _____
15 This Document Relates To:
16     ALL ACTIONS.
17 _____

No. C-06-07660 RMW

ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

**[Re Docket Nos. 30, 31, 34]**

18
19     Plaintiffs City of Worchester Retirement System, Lynn Short, James Rocco, and Robert
20 Lynch ("plaintiffs") bring the present action as a derivative suit on behalf of Finisar Corporation
21 ("Finisar") against certain current and former directors and officers of Finisar. Nominal defendant
22 Finisar moves to dismiss the first amended complaint ("FAC") for failure to make demand against
23 the company or to plead with particularity that demand should be excused. Individual defendants
24 David Buse, Michael Child, John Drury, Mark Farley, Roger Ferguson, David Fries, Harold Hughes,
25 Frank Levinson, Jan Lipson, Larry Mitchell, Gregory Olsen, Jerry Rawls, Robert Stephens,
26 Dominique Trempont, Stephen Workman, and Joseph Young move to dismiss the FAC for failure to
27 state a claim. Individual defendant Richard Lieb moves separately to dismiss the claims against him
28 for failure to state a claim. The individual defendants also move to dismiss the claims against them
as time-barred. Plaintiffs oppose the motions. The court has read the moving and responding papers

and considered the arguments of counsel. For the reasons set forth below, the court GRANTS defendants' motions to dismiss. Plaintiffs have twenty (20) days' leave to file an amended complaint.

## I. FACTS

### A. Background

Finisar is a Delaware corporation with its principal executive offices in Sunnyvale, California. FAC ¶ 38. It is a provider of optical networking components and services for network and storage applications. *Id.* Finisar became a public company on November 11, 1999. *Id.* Its common stock is listed on the Nasdaq under the stock symbol FNSR. Plaintiffs assert violations of federal securities and state laws against certain current and former members of Finisar's board of directors. Plaintiffs allege that defendants manipulated grant dates and associated documentation of stock options granted to the company's officers and directors and filed false financial statements and press releases to hide the purported stock option backdating scheme from Finisar shareholders. *Id.* ¶¶ 2, 6-7, 9-10. Plaintiffs complain that defendants acted in concert with one another in furtherance of a common plan in which they purposefully engaged in the alleged stock option backdating scheme. *Id.* ¶¶ 77-78. Plaintiffs' claims cover the period from 2000 through 2006. *Id.* ¶ 71.

At the time plaintiffs filed the present suit, Finisar's board of directors consisted of defendants Rawls, Ferguson, Fries, Levinson, Mitchell, Stephens, and Trempont. *Id.* ¶ 18. Defendant Rawls has served as chief executive officer ("CEO") and director of Finisar since 1989. *Id.* ¶ 39. He has also previously served as the company's president. *Id.* Defendant Ferguson has been a director of Finisar since August 1999 and was a member of the Compensation Committee for the fiscal years ended April 2000 through April 2006. *Id.* ¶¶ 45, 67. Defendant Fries has served as a director since June 2005 and was a member of the Compensation Committee for the fiscal year ended April 2006. *Id.* ¶¶ 46, 67. He serves as chairman of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. *Id.* Defendant Levinson founded Finisar in 1988 and has served as a director since. *Id.* ¶ 44. Levinson has also previously served as CEO, chairman of the board, and chief technical officer. *Id.* Defendant Mitchell has served as a director since October 1999 and was a member of the Compensation Committee for the

1  fiscal years ended April 2004, 2005, and 2006. *Id.* ¶¶ 47, 67. Defendants Stephens and Trempont

2  have served on Finisar's board since August 2005. *Id.* ¶¶ 48-49. Stephens served on the

3  Compensation Committee for the fiscal year ended April 2006. *Id.* ¶ 67.

4  　　　Ferguson served on the Audit Committee for the fiscal years ended April 2000 through April

5  2006. *Id.* ¶ 67. Mitchell served on the Audit Committee for the fiscal years ended April 2001

6  through April 2006. *Id.* Trempont served on the Audit Committee for the fiscal year ended April

7  2006. Each of the director defendants signed Finisar's annual reports on Form 10-K filed with the

8  Securities and Exchange Commission ("SEC") during their terms as directors.

9  　　　Defendant Lieb served as a director of Finisar from 1999 through June 2002. *Id.* ¶ 51. In his

10 capacity as a member of the board of directors, he signed Finisar's annual report filed with the SEC

11 in 2000 and 2001. *Id.*

12 　　　**B.　　Stock Option Plans**

13 　　　As part of its compensation to directors, officers, and other employees, Finisar grants stock

14 options which they publicly disclose as having an exercise price equal to the fair market value of its

15 common stock at the date of the stock option grant. *Id.* ¶¶ 80-82. Stock options are granted

16 pursuant to either the 1989 Stock Option Plan, the 1999 Stock Option Plan, or the 2005 Stock

17 Option Plan. *Id.* ¶¶ 81, 83. At all relevant times Finisar's stock option plans provide that "options

18 could be granted at an exercise price of no less than 85% of the fair value of the company's common

19 stock on the date of grant." *Id.* ¶ 81.[1] According to Finisar's disclosures in its proxy statements and

20 annual reports on Form 10-K, all of Finisar's option grants were granted at the fair market value of

21 its common stock on the date of grant. *Id.* ¶¶ 82-84. These stock option plans do not set fixed dates

22 for granting stock options. Rather, those who are responsible for issuing the grants have the

23 discretion to select the dates of issuance. *Id.* ¶ 87.

24 

25 [1]　　　The court notes that plaintiffs allege in paragraph 81 of their complaint that Finisar's stock
option plans provided that stock options may be issued with an exercise price of no less than 85% of
26 the fair market value of the common stock on the date of grant while in paragraph 103 they assert
that defendants violated Finisar's option plans by failing to price all stock options at 100% of the fair
27 market value of the common stock on the date of grant. *See* FAC ¶ 103 ("Backdating the date of
issuance of the executive stock options also violated Finisar's stock option plans, which provided
28 that the exercise price of options to purchase Finisar common stock shall not be less than 'an
exercise price equal to the market price of Common Stock on the date of grant.'").

**C.    Allegedly Backdated Stock Options**

Plaintiffs allege that a number of stock option grants since 2000 were backdated, including grants to top executive officers and directors.  Plaintiffs contend that all of the grants "made by and/or to defendants during the Relevant Period were granted at or near the lowest closing price for the month and/or fiscal quarter or preceding a significant increase in the price of stock." *Id.* ¶ 100.  Under plaintiffs' theory, "[b]ecause the odds of such an occurrence happening randomly are so remote, the only likely explanation for this pattern is that their stock options had been back- or misdated." *Id.*  By backdating stock options, defendants allegedly disguised higher compensation paid to officers, directors, and employees, avoided having to record additional compensation charges for granting "in-the-money" stock options, conferred great personal financial benefits upon defendants, and contravened its public disclosures that Finisar's stock options are granted at an exercise price equal to the fair value of the stock on the grant date. *Id.* ¶¶ 104-08.  Plaintiffs further allege that defendants knew but failed to disclose that the exercise price of each purportedly backdated stock option was less than the market price of the stock on the actual grant dates. *See id.* ¶¶ 109-11, 116, 124, 129, 135, 144, 150.

**1.    June 15, 2000 Grant**

Plaintiffs allege that on June 15, 2000 Finisar granted stock options with an exercise price of $21.56 per share, which was the third lowest share price for that month. *Id.* ¶ 88.  Plaintiffs contend these option grants were backdated and that the stock would have had a 20-day cumulative return of 57.97% based on the exercise price. *Id.*  Defendant Farley received 105,000 stock options, defendants Lipson and Workman each received 65,000 stock options, and non-defendant Richard Woodrow received 65,000 stock options on that date. *Id.*  Plaintiffs assert that the Form 4 was not filed until October 5, 2001. *Id.*

**2.    August 15, 2000 Grant**

Plaintiffs allege that on August 15, 2000 Finisar granted stock options with an exercise price of $32.50 per share. *Id.* ¶ 89.  Plaintiffs contend these options were backdated and that the stock would have had a 20-day cumulative return of 31.54% based on the exercise price. *Id.*  According to

plaintiffs, on that date a non-defendant officer, Dallas Meyer, received 350,000 option grants. Plaintiffs also assert that the Form 4 was not filed until October 5, 2001. *Id.*

### 3. October 18, 2000 Grant

Plaintiffs allege that on October 18, 2000 Finisar granted stock options with an exercise price of $30.88 per share. *Id.* ¶ 90. Defendant Olsen received 300,000 stock options on that date. *Id.* Plaintiffs contend these option grants were backdated. *Id.* On the day these stock options were granted, Finisar also announced the completion of its acquisition of Sensors Unlimited, Inc. which caused Finisar's stock price to rise sharply to $37.00 per share two days later. *Id.*

### 4. April 3, 2001 Grant

Plaintiffs allege that on April 3, 2001 Finisar granted options with an exercise price of $7.06 per share, which was the third lowest share price for that month. *Id.* ¶ 91. According to plaintiffs, non-defendant Dallas Meyer received 350,000 option grants on that date. Plaintiffs contend these option grants were backdated and that the stock would have had a 20-day cumulative return of 212.92% based on the exercise price. *Id.* Plaintiffs also assert that the Form 4 was not filed until October 5, 2001. *Id.*

### 5. October 10, 2001 Grant

Plaintiffs allege that on October 10, 2001 Finisar granted options with an exercise price of $5.00 per share, which plaintiffs note was the eighth lowest share price for that year. *Id.* ¶ 92. Defendants Farley, Olsen, and Workmen each received 100,000 stock options, defendant Lipson received 60,000 stock options, and non-defendants Meyer and Woodrow received 100,000 stock options on that date. *Id.* Plaintiffs contend these option grants were backdated and that the stock would have had a 20-day cumulative return of 114.00% based on the exercise price. *Id.* Plaintiffs further assert that the Form 4 was not filed until July 24, 2002. *Id.*

### 6. June 7, 2002 Grant

Plaintiffs allege that on June 7, 2002 Finisar granted options with an exercise price of $1.73 per share. *Id.* ¶ 93. Plaintiffs contend these option grants were backdated and that the stock would have had a 20-day cumulative return of 12.72% based on the exercise price. *Id.* Defendants Farley and Workman each received 200,000 stock options, defendants Ferguson and Mitchell each received

20,000 stock options, defendants Levinson and Rawls each received 1,000,000 stock options, and non-defendant Richard Woodrow received 200,000 stock options at that exercise price. *Id.* Plaintiffs assert that the Form 4 was not filed until June 12, 2003. *Id.*

### 7. April 29, 2003 Grant

Plaintiffs allege that Finisar granted options dated April 29, 2003 with an exercise price of $0.76 per share. *Id.* ¶ 94. Plaintiffs contend these option grants were backdated and that the stock would have had a 20-day cumulative return of 85.53% based on the exercise price. *Id.* Non-defendant Fariba Danesh, a "top executive officer," received 750,000 stock options on that date. *Id.* Plaintiffs assert that the Form 4 was not filed until June 12, 2003. *Id.*

### 8. August 27, 2003 Grant

Plaintiffs allege that Finisar granted options dated August 27, 2003 with an exercise price of $1.95 per share. *Id.* ¶ 95. Plaintiffs contend these option grants were backdated and that the stock would have had a 20-day cumulative return of 28.21% based on the exercise price. *Id.* Defendants Levinson and Rawls each received 200,000 stock options and defendant Workman received 75,000 stock options on that date. Non-defendant Fariba Danesh received 100,000 stock options on that date. *Id.* Plaintiffs assert that the Form 4 was not filed until June 14, 2004. *Id.*

### 9. September 5, 2003

Plaintiffs allege that Finisar granted options dated September 5, 2003 with an exercise price of $2.18 per share. *Id.* ¶ 96. Plaintiffs contend these option grants were backdated and that the stock would have had a 20-day cumulative return of 18.81% based on the exercise price. *Id.* Non-defendant Fariba Danesh received 650,000 stock options on that date. *Id.* Plaintiffs assert that the Form 4 was not filed until February 13, 2004. *Id.*

### 10. December 18, 2003

Plaintiffs allege that Finisar granted options dated December 18, 2003 with an exercise price of $2.80 per share, the lowest share price for that month. *Id.* ¶ 97. Plaintiffs contend these option grants were backdated. *Id.* Defendant Buse received 400,000 stock options on that date. *Id.* Plaintiffs assert that the Form 4 was filed December 22, 2003 when the stock closed at $3.09. *Id.*

### 11.     October 29, 2004

Plaintiffs allege that Finisar granted options dated October 29, 2004 with an exercise price of $1.47 per share. *Id.* ¶ 98. Plaintiffs contend these option grants were backdated. *Id.* Defendant Young received 400,000 stock options on that date. *Id.* Plaintiffs assert that the Form 4 was filed November 2, 2004 when the stock closed at $1.67. *Id.*

### 12.     August 31, 2005

Plaintiffs allege that Finisar granted options dated August 31, 2005 with an exercise price of $0.91 per share, the fifth lowest share price for that year. *Id.* ¶ 99. Plaintiffs contend these option grants were backdated. *Id.* Defendants Stephens and Trempont each received 30,000 stock options on that date. *Id.* Plaintiffs assert that the Form 4 was filed September 2, 2005 when the stock closed at $1.17. *Id.*

### D.     Internal Investigation

On November 30, 2006 Finisar announced that it was conducting an internal investigation, with the assistance of independent legal counsel, into its stock options granting practices during 1999 through 2006 and that preliminary investigations indicate that it was likely that measurement dates for certain stock option grants differed from the recorded grant dates. *Id.* ¶ 215. Finisar indicated that its financial statements filed for the fiscal year ended April 30, 2001 and thereafter should no longer be relied upon and that it would delay filing of its Form 10-Q for the quarter ended October 29, 2006. *Id.*

On June 12, 2007 Finisar announced the initial findings of the Audit Committee's review. *Id.* ¶ 218. It disclosed that "[t]he measurement dates for a number of option grants differed from the recorded grant dates. Those errors generally resulted from a deficient and poorly documented process as well as a lack of attentiveness and a lack of thorough understanding of relevant accounting rules on the part of the individuals involved in the granting process." *Id.* Further, Finisar disclosed that their were "administrative issues" with the annual grants to existing employees, namely that there was a lack of contemporaneous documentation to verify the grant dates, the grant dates were selected before the list of options to be granted had been finalized and, in one instance, an earlier date with a more favorable price was selected retrospectively for the annual

United States District Court

For the Northern District of California

grant. *Id.* With respect to newly hired employees and employees hired in connection with acquisitions, the Audit

Committee noted instances in which option grants were delayed and a more favorable exercise price resulted and some instances in which a more favorable exercise price was selected retrospectively. *Id.* Finisar further stated that the company personnel involved in selecting the grant dates for these mispriced stock options did not benefit from those grants and that there was no malfeasance uncovered on the part of any officer, director, or employee. *Id.* According to Finisar's June 2007 announcement it was in the process of finalizing revised measurement dates to determine the financial statement and tax impact of the necessary correction. *Id.*

In the June 12, 2007 Form 8-K Finisar also stated that "options to directors and officers were properly approved and granted by the Board or the Board's Compensation Committee." Decl. Aelish M. Baig Supp. Pls.' Opp'n, Ex. 1 at 5. Further, in response to the result of the investigation, Finisar noted that the Board adopted certain remedial measures, including training for personnel involved in equity compensation, involvement of designated finance employees in the recording and accounting of equity compensation, addition of policies to ensure the prompt recording of stock option grants, setting fixed dates for the completion of the list of recommended optionees and grant amounts prior to submission of such lists to the Compensation Committee for approval, and requiring the internal audit department to review and report to the Audit COmmittee on the company's compliance with controls and procedures for equity compensation at least annually. *Id.* at 6.

## II. ANALYSIS

Although plaintiffs filed this suit derivatively on behalf of Finisar, they did not first make demand upon the board. Plaintiffs allege that demand would be futile essentially because (1) six of the seven members of the board at the time the complaint was filed received backdated stock options, (2) four of the directors (Ferguson, Fries, Mitchell, and Stephens) served on Finisar's Compensation Committee during the relevant period, (3) three of the directors (Ferguson, Mitchell, and Trempont) served on Finisar's Audit Committee during the relevant period, and (4) all of the directors signed Finisar's Form 10-K which contain the alleged fraudulent statements regarding the exercise price of stock option grants.

### A. Legal Standards

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. Dismissal can be based on the "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988). When evaluating a Rule 12(b)(6) motion, the court must accept all factual allegations in the complaint as true. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1955 (2007); *Barron v. Reich*, 13 F.3d 1370, 1374 (9th Cir. 1994). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions." *Bell Atlantic Corp.*, 127 S. Ct. at 1964-65 (citations and edit marks omitted). Moreover, "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Id.* (citations omitted). The court is not required to accept conclusory legal allegations "cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).

"A shareholder seeking to vindicate the interests of a corporation through a derivative suit must first demand action from the corporation's directors or plead with particularity the reasons why such demand would have been futile." *In re Silicon Graphics Inc. Securities Litig.*, 183 F.3d 970, 989-90 (9th Cir. 1999) (citing Fed. R. Civ. P. 23.1). The circumstances which make a demand futile are established by the laws of the state in which the corporation is incorporated. *Id.* at 990. Finisar is incorporated in Delaware and, as such, the court turns to Delaware law to consider whether demand is excused.

### B. Applicable Test for Demand Futility

Under Delaware law a shareholder's right to pursue a corporate claim derivatively "is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have wrongfully refused to do so or where demand is excused because the directors are incapable of making an impartial decision regarding such litigation." *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993). "Where the board's actions cause the shareholders' complaint, 'a question is rightfully raised over whether the board will pursue these claims with 100% allegiance to the corporation, since doing so may require that the board sue *itself* on behalf of the corporation.'" *Ryan*

*v. Gifford*, 918 A.2d 341, 352 (Del. Ch. Feb. 6, 2007), *quoting Sanders v. Wang*, 1999 WL 1044880, *11 (Del. Ch. 1999). Demand may be excused if plaintiff makes particular allegations raising a reasonable doubt that (1) a majority of the board of directors in place at the time of the complaint is disinterested or independent or (2) the challenged acts were the product of the board's valid exercise of business judgment. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). However, "where the challenged transaction was not a decision of the board upon which plaintiff must seek demand," the test set forth in *Rales* applies.[2] *Ryan*, 918 A.2d at 353. That is, "plaintiff must 'create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.'" *Id.* at 353, quoting *Rales*, 634 A.2d at 933-34. The issue of independence is "a fact-specific determination made in the context of a particular case." *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1049-50 (Del. 2004).

In the present suit plaintiffs allege that the Compensation Committee "reviews and recommends to the Board of Directors the compensation and benefits of all of [Finisar's] executive officers and establishes and reviews general policies relating to compensation and benefits of [Finisar's] employees." FAC ¶¶ 112, 117, 130, 136, 145, 151. In *Ryan*, the Delaware Chancery Court held that although the *Rales* test applies where the challenged decision is one of a committee of the board rather than the full board at the time of the complaint, the *Aronson* test applies where at least one half or more of the board sits on that committee. *Id.* at 352-53. There, three of the six board members served on the compensation committee at all times relevant to the complaint. *Id.* at 353. The court concluded that the *Rales* test applied.

Here, plaintiffs allege that the Compensation Committee administers the grant of options to Finisar's executive officers. Accordingly, the threshold issue of whether the *Aronson* test or the *Rales* test applies turns on whether at least half of the board as constituted at the time the complaint was filed served on the Compensation Committee during the periods backdating occurred. Plaintiffs

---

[2] The *Rales* court noted that this situation would arise in three principal scenarios: (1) where a majority of the directors of the board making the decision have been replaced, (2) where the subject of the suit is not a business decision of the entire board, and (3) where the challenged decision was made by the board of a different corporation. 634 A.2d at 934.

1   allege that defendants Rawls, Ferguson, Fries, Levinson, Mitchell, Stephens, and Trempont were

2   members of the board at the time the complaint was filed and four of these directors served on the

3   Compensation Committee during various times when backdating purportedly occurred. Specifically,

4   Ferguson served on the Compensation Committee for the fiscal years ended April 2000 through

5   April 2006, Mitchell served on the Compensation Committee for the fiscal years ended April 2004

6   through April 2006, and Fries and Stephens served on the Compensation Committee for the fiscal

7   year ended April 2006. FAC ¶ 67.

8        Finisar argues that although plaintiffs have asserted that four directors served on the

9   Compensation Committee, the *Aronson* test is nevertheless inapplicable because Stephens did not

10  join the board until August 31, 2005 and plaintiffs' allegations fail to show that the August 31, 2005

11  grants or that particular option grants after August 31, 2005 were backdated. In other words,

12  Stephens' August 31, 2005 option grant coincides with the date he first started service on Finisar's

13  board, providing an independent basis to support that the measurement date of his option grant is

14  properly August 31, 2005. *See, e.g., In re CNET Networks, Inc. Shareholders Deriv. Litig.*, 483 F.

15  Supp. 2d 947, 960 (N.D. Cal. 2007) ("Mere reliance on the numbers is not sufficient when plaintiffs

16  are confronted with a legitimate, judicially-noticeable explanation for the grant date."). Plaintiffs

17  fail to provide any argument in their opposition supporting that the August 31, 2005 grants were

18  backdated and plaintiffs' allegations fail to show that the August 31, 2005 stock option grants were

19  backdated.

20       First, as alleged, the grant price on that date was the fifth lowest share price for the year (and

21  month).[3] FAC ¶ 99. Although an option grant need not be at the lowest price of the month to

22  support an inference of backdating, one dated at the fifth lowest price seem at least equally plausible

23  the result of chance. Second, plaintiffs' own allegations indicate that the Form 4 reporting these

24  option grants were timely filed within two days of the grant date with the SEC. Therefore, the

25  maximum number of days by which Finisar could have backdated these option grants was by two

26  days. *See In re Openwave Sys., Inc. Shareholder Deriv. Suit*, 503 F. Supp. 2d 1341, 1349 (N.D. Cal.

27

28  _____
    [3]    It is unclear whether plaintiffs refer to the calendar year 2006 or Finisar's fiscal year ended
    April 2006.

2007) (holding that timely Form 4 filings "somewhat diminish the ability to infer backdating").

Third, Finisar announced on August 2, 2005 that Stephens (and Trempont) would be joining its board of directors on August 31, 2005. Decl. of David Banie Supp. Defs.' Mots. Dismiss ("Banie Decl."), Ex. G (August 2, 2005 Form 8-K).[4] That August 31, 2005 was the date Stephens and Trempont joined the board supports a conclusion that that date was the proper measurement date for their grant and weighs against an inference of backdating absent particularly pleaded facts showing that the grant date is not the proper measurement date.[5] Moreover, as defendants contend, there is an inference that backdating did not occur because the August 31, 2005 grant date was announced in advance. *Compare In re CNET*, 483 F. Supp. 2d at 959 (finding an inference of backdating where the press release announcing the purpose of the stock option grant came several days after the grant date and noting that had the public announcement been contemporaneous with the grant date, the inference of backdating could have been negated). In light of these facts, plaintiffs' allegations do not support a finding that the August 31, 2005 option grants were backdated.

Because the factual allegations do not indicate that backdating occurred for the August 31, 2005 grant and plaintiffs do not assert that any particular option grants after August 31, 2005 was backdated, plaintiffs' pleadings show that only three of the directors served on the Compensation

---

[4] Defendants request that the court take judicial notice of certain filings with the Securities and Exchange Commission ("SEC"), some of which are referenced in the complaint, and of Finisar's closing stock prices for the period of the alleged backdating. See Defs.' Req. Judicial Notice Supp. Mots. Dismiss. Defendants' request is granted. Finisar's public filings with the SEC are properly the subject of judicial notice in a motion to dismiss. *See, e.g., In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 953-54 (N.D. Cal. 2007); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 865 (N.D. Cal. 2004); *In re Calpine Sec. Litig.*, 288 F. Supp. 2d 1054, 1076 (N.D. Cal. 2003). In addition, a court may take judicial notice of "documents crucial to the plaintiff's claims, but not explicitly incorporated in his complaint." *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998). Finisar's closing stock price is public information "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned" and are the proper subject of judicial notice in a motion to dismiss. *See* Fed. R. Evid. 201; *see also Plevy v. Haggerty*, 38 F. Supp. 2d 816, 821 (C.D. Cal. 1998) (taking judicial notice of publicly available stock prices).

[5] Under Generally Accepted Accounting Principles ("GAAP"), the measurement date of a stock option grant is defined as "the first date on which are known both: (1) the number of shares that an individual employee is entitled to receive and (2) the option or purchase price, if any." *Accounting Principles Board Opinion No.* 25, "Accounting for Stock Issued to Employees" ("APB 25"). Here, Stephens and Trempont were issued stock option grants contemporaneous with their commencement of service on the board of directors.

Committee during the alleged backdating.[6]  Therefore, under *Ryan*, the test set forth under *Rales*

applies to determine whether demand is futile.  Demand is excused if plaintiffs' allegations set forth,

with particularity, that a majority of the board as constituted at the time their complaint was filed

cannot consider a demand with impartiality.

**B.    Demand Futility**

As stated by the *Rales* court, "[t]he question of independence flows from an analysis of the

factual allegations pertaining to the influences upon the directors' performance of their duties

generally, and more specifically in respect to the challenged transaction."  634 A.2d at 933.  Demand

will be excused only if the derivative plaintiff satisfies the burden of setting forth particularized

factual allegations that create a reasonable doubt that the board at the time of the complaint could

have properly exercised its independent and disinterested business judgment.  *Id.*  Here, plaintiffs

allege that: (1) six directors received purportedly backdated stock options; (2) four directors served

at various times on the Compensation Committee responsible for overseeing employee

compensation and benefits and approving stock option grants; (3) three directors (Ferguson,

Mitchell, and Trempont) served on Audit Committee responsible for overseeing the accounting and

financial reporting processes; and (4) all of the directors signed Finisar's annual reports on Form 10-

K containing the purportedly false and misleading financial statements.  *See* FAC ¶¶ 222-36.  Thus,

---

[6]    Finisar's disclosure of the backdating uncovered by the internal investigation identified backdating of option grants to employees between 2000 and 2005.  FAC ¶ 218.  It is unclear whether Finisar's disclosure refers to its fiscal year end (which ends in April) or to the calendar year.  If the reference is to the calendar year, it is possible that director Young served on the Compensation Committee when backdating occurred.  However, plaintiffs do not so allege.  As discussed, plaintiffs do not allege any particular backdated option grant approved after Young joined the Compensation Committee.  Moreover, the court notes, even if the *Aronson* test applies, plaintiffs have not alleged sufficient facts to show that the directors' acts were not the product of business judgment.  In particular, plaintiffs allege that the Compensation Committee was charged with recommending and reviewing compensation and benefits to Finisar's *executives*.  Although Finisar disclosed that certain stock option grants had been improperly dated, those option grants were issued to rank-and-file employees.  Plaintiffs do not allege what the Compensation Committee's role (or the board's role) is with respect to such grants and with respect to the backdating that occurred.  *Compare Conrad v. Blank*, 2007 WL 2593540, *8 (Del. Ch. 2007) (holding that Compensation Committee's knowing approval of backdated grants could be inferred where the backdated grants were made to two directors whose option grants were administered by the Compensation Committee whereas the stock option plan specifically required all option grants to be priced at 100% of the market value of the stock on the grant date).  While plaintiffs allege that 12 grants to directors and officers were backdated, as discussed in this order, plaintiffs' allegations fail to plausibly support that the 12 selected grants to officers and directors were backdated.

1  plaintiffs' claim that demand would be futile is premised on their assertion that a majority of

2  directors cannot consider demand impartially either because they received backdated option grants

3  or they approved backdated option grants.

### 1.  Alleged Receipt of Backdated Stock Options

5      A director is deemed not disinterested if he or she received backdated options. *See*

6  *Desimone v. Barrows*, 924 A.2d 908, 917 (Del. Ch. 2007) (holding that director is not disinterested

7  on the basis that the director received backdated stock options); *see also In re Verisign, Inc., Deriv.*

8  *Litig.*, 2007 WL 2705221, *12 (N.D. Cal. Sep. 14, 2007) ("If a plaintiff can plead with particularity

9  that a director knowingly received backdated grants, that director will be considered interested.")

10  (citing *In re Zoran Corp. Deriv. Litig.*, 511 F. Supp. 2d 986, 1002-03 (N.D. Cal. 2007).  As in other

11  backdating suits, plaintiffs argue that their claims that there was a pattern of backdating are

12  supported by (1) allegations of specific, fortuitously-timed stock option grants, and (2) allegations

13  regarding the cumulative returns based on the grant price during the 20 trading days following the

14  purportedly backdated grant date.  *See Ryan*, 918 A.2d at 354; *see also In re Openwave*, 503 F.

15  Supp. 2d at 1347-48.  Whether backdating is indicated depends on the particular factual allegations

16  regarding the challenged option grants.  *See Rales*, 634 A.2d at 933 ("The question of independence

17  flows from an analysis of the factual allegations pertaining to the influences upon the directors'

18  performance of their duties generally, and more specifically in respect to the challenged

19  transaction."); *In re CNET*, 483 F. Supp. 2d at 958-59.

20      Plaintiffs allege that 12 specific option grants to officers and directors were backdated

21  because (1) the options were priced at the lowest or one of the lowest share price of the month or

22  fiscal quarter and (2) the cumulative return over the ensuing 20 trading days for these grants were

23  substantial.  *See* FAC ¶¶ 88-99.[7]  Finisar argues that plaintiffs' allegations do not support an

24  inference that these grants to directors and officers were backdated since plaintiffs merely "cherry-

---

26  [7]      The cumulative returns, as alleged, range from 12.72% to 212.92%.  Specifically, plaintiffs
alleged 20-day cumulative returns of 57.97% for the June 15, 2000 grant, 31.54% for the August 15,
2000 grant, 212.92% for the April 3, 2001 grant (to an executive not named as a defendant in this
27  suit), 114% for the October 10, 2001 grant, 12.72% for the June 7, 2002 grant, 85.53% for the April
29, 2003 grant, 28.21% for the August 27, 2003 grant, and 18.81% for the September 5, 2003.  FAC
28  ¶¶ 88-96.  Plaintiffs did not provide the returns for all 12 option grants alleged to have been
backdated.

picked" 12 option grants without indicating why these grant dates were significant as compared to other grants and without reference to what percentage of total reported grants these 12 represent. Finisar further argues that the exercise prices and allegations of the cumulative returns 20-days following each of the 12 grants fail to suggest that the options were granted. Moreover, Finisar submits, the internal investigation concluded that the improperly identified grants were grants issued to employees, not to directors or officers, and that option grants to directors and officers were all properly issued and approved. *See* Baig Decl., Ex. 1 at 5 (Finisar's June 12, 2007 disclosure on Form 8-K).

Plaintiffs rely substantially on the Delaware Chancery Court ruling in *Ryan* to support their contention that their allegations sufficiently excuse demand. However, plaintiffs' allegations differ substantially from those in *Ryan* and, therefore, plaintiffs' reliance upon the *Ryan* holding is unavailing. First, in finding demand futile the *Ryan* court emphasized that the plaintiffs pointed to nine option grants, *all* of which occurred during the lowest price of the month or year in which it was granted. 918 A.2d at 354. Here, unlike the allegations by the plaintiffs in *Ryan*, plaintiffs do not point to a series of stock options priced at the low of each month or relevant period. Rather, plaintiffs point to 12 option grants over a six year period, two of which are priced at the lowest closing stock price of the month, two of which are priced at the third lowest stock price of the month, two of which are priced at the fifth lowest stock price, one of which is priced at the sixth lowest stock price, one of which is priced at the eighth lowest stock price of the month, one of which is priced at the ninth lowest closing stock price, one of which is priced at the eleventh lowest stock price, one of which is priced at the eighteenth lowest (or fourth highest) closing stock price of the month, and one of which is priced at the highest stock price of the month. Of the 12 purportedly backdated stock options to officers and directors, only three grants included grants to directors. These were the June 7, 2002 grant at the ninth lowest price of the month, the August 27, 2003 grant at the eighteenth lowest or fourth highest closing stock price of the month, and the August 31, 2005 grant at the fifth lowest closing stock price for the month.

Plaintiffs also submit the recent Delaware decision in *Conrad* in support of their claim that demand is futile. However, plaintiffs' allegations are distinguishable from the allegations in *Conrad*

where the Delaware Chancery Court concluded that the allegations of backdating and directorial interest rendered demand futile. Specifically, in *Conrad*, the court observed that of the 12 discretionary stock options alleged to have been backdated by the Compensation Committee, two coincided with the lowest trading price of the fiscal quarter, six coincided with the lowest trading days of the month in which the options were granted, and four "had similarly favorable grant dates." 2007 WL 2593540, *4. The court cited plaintiffs' "detailed allegations of a substantial number of option grants that were priced at the low for the month, the quarter, or were otherwise favorably timed to further buttress an inference of backdating." *Id.* Although a stock option need not be priced at the lowest stock price of the month in order to support an inference of backdating, *see e.g., In re CNET*, 483 F. Supp. 2d at 961, the wide varying range of exercise prices for the 12 stock grants which plaintiffs allege were backdated more plausibly support an inference that the grant dates were random rather than deliberately selected based on the stock price. *See, e.g., In re Openwave*, 503 F. Supp. 2d at 1350 (noting that one would expect some percentage of option grants to be priced at the lowest or near lowest price of any given month based on general probabilities).

Moreover, plaintiffs rely only upon an allegation of the 20-day return on the selected grants without any comparison to market returns over the comparable period. In comparison, the *Ryan* plaintiffs supported their allegations of the stock option prices with empirical evidence suggesting that backdating occurred. *Id.* Specifically, the plaintiffs provided a Merrill Lynch analysis that "measured the extent to which stock price performance subsequent to options pricing events diverged from stock price performance over a longer period of time to measure the aggressiveness of the timing of option grants." *Id.* The analysis indicated that the stock options to management had an average annualized return of 243% compared to the 29% annualized market returns. *Id.* The court found that the strong empirical data and the allegation that options were granted sporadically rather than on set times support a finding that the timing of the option grants was "too fortuitous to be mere coincidence." *Id.* at 355. Thus, there, plaintiffs' allegations provided sufficient particularity to excuse demand. *Id.* Similarly, the *Conrad* court noted the importance of the plaintiff's analysis of the astonishing returns of the option grants in comparison to the annualized return of the common stock over the same period to its decision that the allegations support a finding that the challenged

1  options were backdated. 2007 WL 2593540, *5,*8. Absent any statistical analysis of the returns on

2  the option grants compared to market returns the court cannot conclude from plaintiffs' allegations

3  that the timing of the option grants were deliberate rather than due to mere coincidence. Notably,

4  unlike in *Ryan*, the court cannot determine whether the noted 20-day return is "aggressive" in

5  comparison to market returns during the same period. *See In re CNET*, 483 F. Supp. 2d at 956

6  ("Sound analytical methods are one way that plaintiffs could have eliminated the possibility that the

7  returns from the grants were the product of dumb luck. Without them, that inference is more

8  difficult to support."); *see also In re Openwave*, 503 F. Supp. 2d at 1349-50 (granting a motion to

9  dismiss for failure to make demand for claims alleging violations based on purported stock option

10  backdating for similar deficiencies in the pleadings); *In re Zoran*, 511 F. Supp. 2d at 1003-06

11  (finding demand excused based on backdating allegations buttressed in part by statistical analyses of

12  Zoran's options granting practices provided by an independent expert retained by plaintiffs).

13       In addition, plaintiffs do not indicate what percentage the 12 selected grants represent of the

14  total grants to directors and officers over the period to permit the court to consider the probability of

15  the particular grant dates being selected randomly rather than deliberately. *See, e.g., In re*

16  *Openwave*, 503 F. Supp. 2d at 1350 (noting, for example, that "when looking at a set of

17  approximately 40 randomly granted stock options, one would expect approximately two to fall on

18  the lowest price of any given month" and approximately ten to fall on one of the fifth lowest prices

19  of any given month); *In re Zoran*, 511 F. Supp. 2d at 1004 (determining that the striking pattern of

20  Zoran's favorable grant pricing is "hugely suspicious" based on the number of grants at the lowest or

21  near lowest price of the grant month compared to the total number of grants to directors and officers

22  over the period). Finisar provides its publicly filed proxy statements and Form 4 filings which

23  indicate that there were at least 25 grants to directors and officers over the relevant period.

24  Applying the basic probabilities analysis utilized by the *In re Openwave* court, of the 25 reported

25  grants over the relevant period, one would expect one to two grants to be priced at the lowest price

26  of the month of grant and approximately six grants to be priced at the fifth lowest price or lower of

27  the month of grant. *See In re Openwave*, 503 F. Supp. 2d at 1350. Here, of the 12 allegedly

28  backdated option grants, there are two grants that fall on the lowest price of the month the option

was granted and six option grants that are priced at the fifth lowest price or lower. *See* FAC ¶¶ 88-100. These numbers could be consistent with randomly priced option grants.

Further, as Finisar points out, while the results of the Audit Committee investigation concluded that certain grants to employees were dated on other than the measurement date resulting in a more favorable exercise price for the optionee, the investigation did not identify any misdated grants to officers or directors. *See* FAC ¶ 218 (citing Finisar press release identifying misdated annual option grants to employees, grants to newly hired employees, and grants to employees hired through acquisitions). Indeed, Finisar disclosed affirmatively that the internal investigation concluded that all option grants to directors and officers were properly granted. Plaintiffs suggest in their opposition that the internal investigation was biased or that demand would be futile since Finisar has not disclosed that it will hold any individuals accountable for the admitted backdating or that it will seek recovery from those optionees that benefitted from the backdated option grants. Nevertheless, plaintiffs provide no factual allegations that Finisar's internal investigation identified but failed to disclose improperly dated grants to officers and directors or that the internal investigation was otherwise deficient. Although plaintiffs rely upon *Conrad*, in *Conrad*, the investigation revealed that two *directors* received backdated options and the company failed to indicate that any remedial action would be taken to disgorge the directors of their improperly obtained profits. 2007 WL 2593540, *7-*8. Further, in *Conrad* the company's disclosure indicated that there were "broader errors" than those grants identified as backdated. *Id.* at *7. Here, as discussed, the internal investigation revealed that no directors or officers received misdated stock options and that no individuals involved in selecting grant dates benefitted from the misdated option grants. FAC ¶ 218. The court is reluctant to infer futility of demand on the basis that there has been no disclosure of what remedial action, if any, Finisar will take based on the results of its investigation. Notably, the burden rests on plaintiffs to demonstrate demand is futile based on particularized factual allegations, not by speculation.

Plaintiffs also allege that out of the 12 purportedly backdated stock options, the Form 4 related to 9 of them were filed late. FAC ¶¶ 88-96. Under the Securities Exchange Act of 1934 directors and officers are required to report their ownership of shares of the company's stock as well

as changes in such ownership since the last report within 2 business days following the date of the subject transaction. 15 U.S.C. § 78p(a)(2). The delay in filing a Form 4 with the SEC reporting option grants may support an indication of backdating in that it is theoretically possible to manipulate the grant date during the window between the grant date and the public reporting of the option grant to the SEC. *See In re Zoran*, 511 F. Supp. 2d at 1006 (noting that a late-filed Form 4 is a "warning indicator of backdating"); *In re Openwave*, 503 F. Supp. 2d at 1350; *In re CNET*, 483 F. Supp. 2d at 961. Nevertheless, here, where the allegations otherwise fail to support a clear showing that these grants were backdated, the allegations do not support a conclusion that the Form 4s were late because the late-reported grants were backdated. The court concludes that, without more, plaintiffs' allegations do not support that the 12 grants to directors and officers identified in the complaint were backdated or indicate a pattern of backdating of grants to directors and officers. Thus, demand cannot be excused on the basis that the directors who served on the board at the time plaintiffs' complaint was filed received backdated options.

## 2. Approval of Backdated Options

Even if a director did not receive backdated options, he or she may still not be able to consider demand impartially if the allegations support that the director faces a substantial likelihood of personal liability from knowingly approving the backdated option grants. *Desimone*, 924 A.2d at 914. Here, the court concludes that plaintiffs' allegations fail to indicate that a majority of the board faces a substantial likelihood of personal liability with respect to options backdating. As plaintiffs allege, Finisar has admitted that it misdated stock option grants to employees. *See* FAC ¶ 218. Plaintiffs argue that the four directors who served on the Compensation Committee face a substantial likelihood of personal liability for approving backdated option grants. Plaintiffs allege that Ferguson served on the Compensation Committee and the Audit Committee and allegedly backdated options on a consistent basis. *Id.* ¶ 226(c). Mitchell served on the Compensation Committee and the Audit Committee, Fries and Trempont served on the Audit Committee, and Stephens served on the Compensation Committee. *Id.* ¶¶ 226(d)-226(g).

In *Desimone*, the Delaware Chancery court found similar allegations insufficient to support plaintiffs' claim that demand was futile. In *Desimone*, Sycamore Networks admitted in public filings

that certain grants to employees had been backdated. Nevertheless, the court found that absent more particularized allegations, service on the Compensation Committee alone does not render directors unable to impartially consider demand:

> But the key issue for purposes of this motion is whether the Sycamore board should be divested of its authority to address that misconduct. As to that issue, Desimone has fallen well short of his pleading burden. His complaint is devoid of any factual allegations on the key issues of who approved the Employee Grants and whether any of the directors knew that options were being backdated. Sycamore's stockholder-approved option plans contemplated delegation of the option-granting function to non-director executive officers, and the complaint itself alleges that much of Sycamore's backdating operation was carried out by a single executive officer and was actively concealed from the board and from Sycamore's auditors. No facts in the complaint support an inference that members of the Sycamore board were aware that employees were being awarded backdated options.

*Desimone*, 924 A.2d at 914. As in *Desimone*, plaintiffs' complaint is devoid of any factual allegations of which directors approved which backdated employee grant and whether the directors knew the options were backdated. *Id.* ("Because the complaint is devoid of any facts suggesting a rational inference that any members of the Sycamore board, much less a majority, knew about the backdating of Employee Grants, Desimone has failed to create a reasonable doubt about the Sycamore board's ability to impartially consider a demand as to this category of claim.").[8]

Plaintiffs also allege that Levinson cannot exercise independent judgment regarding the present suit because he served in the dual role of both as chairman of the board and as chief technical officer during the relevant period. FAC ¶ 226(a). Plaintiffs allege that Rawls, as chief executive officer and former president of Finisar knew or should have known stock options were backdated and has inextricable links to management that renders him not independent. *Id.* ¶ 226(b). Plaintiffs' generalized allegation that Levinson cannot consider demand because of his dual role in the company fails to raise any inference that Levinson cannot consider demand for the present suit with impartiality. Likewise, plaintiffs do not allege with particularity why or how Rawls

---

[8]     The court notes that although plaintiffs rely upon *Conrad* for the proposition that directors who authorize backdating options cannot consider demand because they face a substantial likelihood of liability for such authorization, the *Conrad* court distinguished *Desimone*'s holding that *knowing* approval of backdated options renders a director interested by pointing out that the optionees in question were two directors who received significant backdated option grants and that the stock option plan *required* options to be priced at 100% of market price. 2007 WL 2593540 at *8-*9. Here, plaintiffs' allegations indicate that Finisar's option plans require options to be priced a no less than 85% of the fair value of the stock on the grant date.

"inextricable links" to management would impair his ability to consider demand. As discussed above, plaintiffs have failed to allege that grants to directors and officers have been backdated. Plaintiffs' allegations that certain directors (Ferguson, Mitchell, Fries, Stephens, and Trempont) are not disinterested because they sold Finisar shares during the period and profited substantially are also insufficient to excuse demand. They do not claim that the stock sold were the result of stock options favorably backdated. Indeed, plaintiffs do not allege any connection between the directors' inside sales and the alleged backdating. *See In re Verisign*, 2007 WL 2705221 at *13 (finding pleadings insufficient to excuse demand where there were no particularized allegations showing insiders had any knowledge of options backdating or irregularities in the financial statements when they sold shares).

### C. Individual Defendants' Motions to Dismiss

Because the court has concluded that plaintiffs have not adequately alleged that demand should be excused, it need not reach the individual defendants' motion that the complaint should be dismissed for failure to state a claim. The court will, however, address defendant Lieb's motion to dismiss as it appears that the claim against him is particularly weak. Lieb moves separately to dismiss the claims against him on the basis that plaintiffs have failed to allege any facts showing that he was involved in backdating stock options or knowing issuance of false or misleading statements. Plaintiffs' allegations as to defendant Lieb are vague. As alleged, Lieb served as a director from 1999 through June 2002. FAC ¶ 51. Lieb "participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings." *Id.* Further, Lieb signed Finisar's Form 10-K for the 2000 and 2001 fiscal years. *Id.* Plaintiffs' allegations fail to identify any specific improper conduct by Lieb. Further, in opposing the individual defendants' motion to dismiss, plaintiffs do not specifically address Lieb's motion to dismiss or propose that additional facts exist to support any of their claims against Lieb. The court finds that plaintiffs' bare and conclusory allegations against Lieb fail to state a claim against Lieb. Accordingly, plaintiffs' claims against Lieb are dismissed.

//

//

//

### III. ORDER

For the foregoing reasons, the court GRANTS defendants' motions to dismiss. The court, however, acknowledges that the decision is a close one except as to defendant Lieb. Further, based upon the additional information the plaintiffs indicated they had learned, there appears to be a good possibility that plaintiffs can successfully amend. Therefore, plaintiffs are given twenty (20) days leave to amend. However, unless plaintiffs have some additional, individualized facts as to defendant Lieb, the court would not expect him to be named in an amended complaint.

DATED:          1/11/08

_Ronald M Whyte_
RONALD M. WHYTE
United States District Judge

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiffs:**

| | |
|---|---|
| Aelish Marie Baig | AelishB@csgrr.com |
| Travis E. Downs , III | travisd@csgrr.com |
| Shawn A. Williams | shawnw@csgrr.com |
| Monique C. Winkler | shawnw@csgrr.com |
| Lester Rene Hooker | lhooker@saxenawhite.com |
| Alan Roth Plutzik | aplutzik@bramsonplutzik.com |
| Seth Adam Safier | seth@gutridesafier.com |

**Counsel for Defendants:**

| | |
|---|---|
| David Allen Priebe | david.priebe@dlapiper.com |
| Shirli Fabbri Weiss | shirli.weiss@dlapiper.com |
| Lawrence T. Hoyle , Jr. | lhoyle@hoylelawfirm.com |

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:**    1/11/08                                   TSF
                                   **Chambers of Judge Whyte**

United States District Court
For the Northern District of California