1
2
3
4                                                    **E-FILED on** ___09/22/09___
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT
9                   FOR THE NORTHERN DISTRICT OF CALIFORNIA
10                               SAN JOSE DIVISION
11

**United States District Court**
**For the Northern District of California**

12   In re FINISAR CORP. DERIVATIVE          No. C-06-07660 RMW
     LITIGATION
13                                            ORDER GRANTING DEFENDANTS'
     _____     MOTIONS TO DISMISS SECOND
14                                            AMENDED COMPLAINT
     This Document Relates To:
15                                            **[Re Docket Nos. 67, 68, 72]**
        ALL ACTIONS.
16
17
     _____
18

19        Plaintiffs City of Worchester Retirement System, Lynn Short, James Rocco, and Robert

20   Lynch ("plaintiffs") bring the present action as a derivative suit on behalf of Finisar Corporation

21   ("Finisar") against certain current and former directors and officers of Finisar.  Nominal defendant

22   Finisar moves to dismiss the second amended complaint ("SAC") for failure to make demand against

23   the company or to plead with particularity that demand should be excused.  Individual defendants

24   David Buse, John Drury, Mark Farley, Roger Ferguson, David Fries, Harold Hughes, Frank

25   Levinson, Jan Lipson, Larry Mitchell, Gregory Olsen, Jerry Rawls, Robert Stephens, Dominique

26   Trempont, Stephen Workman, and Joseph Young move to dismiss the SAC for failure to state a

27   claim and for being time-barred.  Individual defendant Michael Child moves separately to dismiss

28   the claims against him for failure to state a claim.  Plaintiffs oppose the motions.  The court has read

1  the moving and responding papers and considered the arguments of counsel.  For the reasons set

2  forth below, the court GRANTS defendants' motions to dismiss.

### I. FACTS[1]

4       Plaintiffs assert violations of federal securities and state laws against certain current and

5  former members of Finisar's Board of Directors based on alleged conduct in the granting of stock

6  options.  Specifically, plaintiffs allege that defendants manipulated grant dates and associated

7  documentation of stock options and made false statements in SEC filings and press releases.  SAC

8  ¶¶ 2, 10.  Plaintiffs also allege that defendants benefitted from the scheme through insider trading.

9  *Id.* ¶ 9.  Plaintiffs' claims cover the period from 2000 through 2006 (the "relevant period").  *Id.* ¶ 73.

### A.       Structure of the Board of Directors

11       Finisar's Board of Directors includes an Audit Committee and a Compensation Committee.

12 *Id.* ¶ 59.  The Audit Committee is responsible for financial oversight of the company.  *Id.* ¶¶ 61-62.

13 The Compensation Committee is responsible for (1) reviewing and approving all compensation and

14 benefits for executive officers and (2) establishing and reviewing general policies relating to

15 compensation and benefits for employees.  *Id.* ¶¶ 65-67.

16       At the time plaintiffs filed the present suit, Finisar's Board of Directors consisted of

17 defendants Rawls, Ferguson, Fries, Levinson, Mitchell, Stephens, and Trempont (the "Demand

18 Board").  *Id.* ¶ 24.  Four of these directors, Ferguson, Fries, Mitchell, and Stephens, served on the

19 Compensation Committee during the relevant period.  *Id.*  Three, Ferguson, Mitchell, and Trempont,

20 served on the Audit Committee.  *Id.*  Plaintiffs summarize membership in the Audit and

21 Compensation Committees during the relevant period as follows:

|      | Compensation Committee | Audit Committee |
|------|------------------------|-----------------|
| FY00 | Child, Ferguson        | Child, Ferguson |
| FY01 | Child, Ferguson        | Child, Ferguson, Mitchell |
| FY02 | Child, Ferguson        | Child, Ferguson, Mitchell |
| FY03 | Child, Ferguson        | Child, Ferguson, Mitchell |

---

28 [1]  Additional facts relating to this litigation may be found in this court's previous order, *In re Finisar Corp. Derivative Litig.*, 541 F. Supp. 2d 980, 982-87 (N.D. Cal. 2008).

United States District Court
For the Northern District of California

| FY04 | Child, Ferguson, Mitchell | Child, Ferguson, Mitchell |
| FY05 | Child, Ferguson, Mitchell | Child, Ferguson, Mitchell |
| FY06 | Ferguson, Mitchell, Fries, Stephens | Ferguson, Mitchell, Trempont |

*Id.* ¶ 69. Each of the director defendants signed Finisar's annual reports on Form 10-K filed with the SEC during their terms as directors. *Id.* ¶ 238.

### B.   Stock Option Plans

Finisar granted stock options as part of its compensation to directors, officers, and employees. *Id.* ¶ 82. Stock options were granted pursuant to either the 1999 Stock Option Plan or the 2005 Stock Incentive Plan. *Id.* ¶¶ 83-84. Under the text of both plans, the exercise price of an option was not to be less than the fair market value of the stock on the effective date of the grant. *Id.* Similar representations were made in the company's proxy statements. *Id.* ¶¶ 85-86.

### C.   Finisar's Internal Investigation

On November 30, 2006, Finisar announced that it was conducting an internal investigation of its options-granting practices from 1999 through 2006 and that based on preliminary results, it was likely that the measurement dates for certain stock option grants were incorrectly recorded. *Id.* ¶ 219. Finisar indicated that it would likely need to restate its financial statements filed for fiscal years ended April 30, 2001 and thereafter, and those statements should not be relied upon. *Id.* On June 12, 2007, Finisar announced the initial findings of its Audit Committee's review. *Id.* ¶ 225. It confirmed that measurement dates for some option grants differed from the recorded grant dates and that financial statements would need to be restated to record charges for compensation expense relating to those past option grants. *Id.*

The details and final results of the investigation were announced in Finisar's Form 10-K filed December 4, 2007. *Id.* ¶ 226 & Ex. D. The investigation was conducted by the Audit Committee with the assistance of independent counsel and forensic accountants. *Id.* at 45. They reviewed all stock option grants made between November 11, 1999 through September 8, 2006 (the "Review Period"), a total of 151 granting actions. *Id.* at 36. The court summarizes some of the findings below.

United States District Court
For the Northern District of California

### 1.        Stock Option Granting Authority

As of February 2000, the Board of Directors had established a Stock Plan Committee comprised solely of the CEO (Rawls) to grant options to newly hired and existing non-officer employees, subject to certain limitations such as a maximum number of shares per employee.[2]  *Id.* at 49.  Grants to existing executive officers were generally approved by the Compensation Committee, either at a meeting or by unanimous written consent ("UWC").  *Id.* at 49-50.  The Board of Directors had sole authority to grant options to employees as part of an acquisition or merger, and to approve options granted to directors.  *Id.* at 50.  During the Review Period, 105 granting actions had been approved by the Stock Plan Committee, 15 by the Compensation Committee, and 31 by the entire Board of Directors.  *Id.*

A broad-based annual performance grant in June 2000 made by the Stock Plan Committee was found to erroneously include a grant to three officers.  *Id.* at 56.  The Audit Committee was unable to find evidence that these grants had been separately approved by the Board of Directors or the Compensation Committee and concluded that the grants had resulted from initial confusion about the scope of the Stock Plan Committee's authority to make option grants.  *Id.*

### 2.        Incorrect Measurement Dates

The investigation results were summarized as follows:

we found evidence that we previously used incorrect measurement dates when accounting for stock option grants pursuant to APB 25 and related interpretations.

---

[2]  Plaintiffs question the existence of this one-man committee, arguing that "[t]he surprise appearance, now, of a one-man Stock Plan Committee, that purportedly did all the granting at issue, is certainly convenient, but hardly credible."  Opp. to Mot. Dismiss SAC of Nominal Def. Finisar Corp. at 23:6-13.  A similar situation arose in *In re MIPS Technologies, Inc. Derivative Litigation*, 542 F. Supp. 2d 968 (N.D. Cal. 2008).  In that case, in response to the investigation report finding that options-granting authority had been delegated to the Vice President of Human Resources, the plaintiff demanded, "[i]f these duties were delegated to [a single member], what was the Committee doing? Why have a committee at all?"  *Id.* at 977.  The court held that such an argument "permits, at best, an inference, but demand excuse requires particularized facts, not stray inferences" and held a boilerplate allegation that other directors "granted and approved" stock options was insufficient without specifying which options were involved.  *Id.*  The stray inference in this case is even weaker, as the Compensation Committee still had other duties to perform after delegating employee grants to Rawls.  Moreover, plaintiffs do not allege anywhere that the Compensation Committee was responsible for approving the grants attributed to the Stock Plan Committee, so the existence of a Stock Plan Committee does not affect the disinterestedness analysis of the other directors.  *See also In re CNET Networks, Inc. Shareholder Derivative Litig.*, 483 F. Supp. 2d 947, 966 (N.D. Cal. 2007) ("Plaintiffs are not entitled to pick and choose which of defendants' statements in public documents favor them and have all others ignored.").

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> We have concluded that revised measurement dates are required for 105, or 70% of the 151 Granting Actions during the Review Period, and that it is necessary to modify the accounting measurements dates for approximately 71% of the stock option grants awarded during the Review Period to employees and consultants. . . . Revising option grant measurement dates results in total additional stock-based compensation expense of $107.6 million to be recognized in the fiscal years 2000 through 2006.

*Id.* at 47.

For grants made by the Stock Plan Committee, including grants to new hires and annual performance grants, the investigation found that changes were made to the list of grantees after the approved grant date. *Id.* at 51, 53. For grants to new hires that had been approved by the Board of Directors or Compensation Committee, the investigators were unable to find evidence of approval contemporaneous with the date designated as the effective date of the grant. *Id.* at 52. These grants were typically approved by UWC, and in some cases the UWCs were prepared after the selected grant date. *Id.* Similarly, in some grants to directors and officers made by UWC, the UWCs were deemed effective as of a date earlier than the date the UWC was signed by the directors, although the UWCs had been sent to the directors on the effective date of the consent or within one day after the consent. *Id.* at 55. Some acquisition-related grants, which were approved by the Board of Directors, were recorded with a grant date that was different than the date specified in the acquisition documents. *Id.* at 54. The investigation report set forth in detail how new measurement dates, if necessary, were selected for these grants based on the available evidence. *Id.* at 52-55.

Specifically with respect to grants by the Stock Plan Committee, the investigation found "process-related deficiencies". *Id.* at 48. However, the investigation found "no evidence of intentional misconduct or malfeasance on the part of Company personnel involved in selecting and approving the grant dates or administering the stock option granting process." *Id.*

Most of the remeasured grants had been made to new hires and non-executive employees, and approximately 85% or $91.1 million of the restatement was attributable to six granting actions between June 2000 and August 2003. *Id.* at 47. None of the past or present members of the Board of Directors received any grants for which the measurement date was ultimately revised, with one exception. *Id.* at 46. In that grant, made to two directors, the exercise price was higher on the date the option was recorded than on the correct date, so no additional compensation expense was recognized. *Id.* at 46, 55.

**United States District Court**
For the Northern District of California

### 3.    Retroactive Selection of Grant Dates

In examining new hire grants, the investigation found that, "in some instances, the evidence showed that the Stock Plan Committee retrospectively selected a grant date with a more favorable price." *Id.* at 52. Similarly, the dates of two performance grants appeared to have been "selected retrospectively to capture a more favorable price." *Id.* at 48.

### 4.    Remedial Measures

In fiscal 2007, before it began its internal review, Finisar adopted several new policies and procedures with respect to its grants of equity compensation awards, including stock options. *Id.* at 48. Authority to make grants was largely restricted to the Compensation Committee, although grants to non-executive officers could be granted by the Board of Directors. *Id.* Except in special circumstances, all awards were to be granted at regular quarterly meetings and not by UWC, and the effective date of such awards was pre-defined. *Id.*

Upon completion of its investigation, the Audit Committee recommended, and the Board of Directors approved, additional changes including: implementation of a cross-functional training program for certain key employees regarding the company's equity compensation program, controls, accounting implications, and legal implications; appointment of a designated finance department employee to be responsible for the accounting of stock options and other forms of equity compensation; adoption of additional policies to ensure that grants are promptly recorded; adoption of policies to ensure a deadline for generating a list of recommended grant recipients and number of shares before submitting them for Compensation Committee approval; and implementation of a requirement that the Internal Audit Department review compliance at least annually. *Id.* at 49.

### D.    Allegedly Backdated Director and Officer Grants

During the relevant period, Finisar issued 17 option grants to directors or officers.[3] *Id.* ¶ 91. These grants were not issued at the same time each year; rather, the issuers had discretion to select the dates of issuance. *Id.* Plaintiffs challenge 12 of these grants, including 3 to Demand Board members. Plaintiffs contend that these grants, consisting of more than 50% of the total number of

---

[3] Defendants assert that there were at least 18 grants and submit SEC filings that evidence 6 grant dates that are not included in the 12 challenged by plaintiffs. Banie Decl. ¶ 8 & Ex. G. As using 17 versus 18 does not impact the court's analysis, the court will accept plaintiffs' number.

1    stock options granted to officers and directors during the relevant period, "were dated: (i) near or on

2    the very day that Finisar stock hit its low price for the month; or (ii) in advance of sharp stock price

3    increases." *Id.* ¶ 88.  The court has previously reviewed the details of each grant, including exercise

4    price, amount, and recipients.  *Finisar*, 541 F. Supp. 2d at 984-86.

5         Plaintiffs analyzed these 12 grants using a "Merrill Lynch analysis".  SAC ¶¶ 92-103.

6    Merrill Lynch developed "a method of analyzing options grants and comparing the returns from

7    such grants to the average investor returns in the same period as a strong indicator of whether

8    backdating likely occurred." *Id.* ¶ 90.  "The analysis . . . calculates the annualized return of the

9    option grants at twenty days after the grant and compares that annualized return with the company's

10   overall annual return." *Id.*  According to plaintiffs' application of this method, the challenged grants

11   resulted in annualized management returns that ranged from around 200% to more than 3000%,

12   while the annualized return for investors was much smaller and often negative.  *Id.* ¶¶ 92-103.

13   Those discrepancies, plaintiffs argue, indicate that the grants were very likely to have been

14   backdated.  *Id.* ¶ 91.

15        In their papers, plaintiffs place particular emphasis on the grant of June 7, 2002.  Opp to Mot.

16   Dismiss SAC of Nominal Def. Finisar Corp. at 10:9-15.  The June 7, 2002 grant was made to a

17   number of top executives, including a majority of the Demand Board (Ferguson, Levinson, Mitchell,

18   and Rawls).  SAC ¶ 97.  The stock price on that day was $1.73 per share.  *Id.*  The price 20 days

19   later was $1.95 per share, resulting in a 20-day cumulative return of 12.72% and an annualized

20   return of 228.9%.  *Id.*  The annualized return for investors was negative 85.3%, a difference of over

21   314%.  *Id.*  The stock price closed lower than the exercise price on 8 out of the 15 trading days in

22   June 2002 subsequent to the grant, including at $1.55 per share 19 days later.  Banie Decl. Supp.

23   Mots. Dismiss SAC, Ex. A.[4]  The Form 4 for the grant was not filed until June 12, 2003.  SAC ¶ 97.

24

25

26   [4]  Defendants request that the court take judicial notice of certain filings with the SEC and of
     Finisar's closing stock prices for the period of the alleged backdating.  Defs.' Request for Judicial
     Notice Supp. Mots. Dismiss SAC.  Defendants' request is granted. *See Finisar*, 542 F. Supp. 2d at
27   989 n.4 (granting similar request).  With respect to the SEC filings, the court takes judicial notice of
     the fact that defendants made such filings and such statements as contained therein but not of the
28   truth of disputed facts stated therein. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir.
     2001).

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II. ANALYSIS

Although plaintiffs filed this suit derivatively on behalf of Finisar, they did not first make demand upon the Board of Directors.  Plaintiffs allege that demand would be futile essentially because all of the directors participated in or benefitted from a scheme to backdate stock options and conceal it from shareholders and the SEC.  Because the court finds that these allegations do not suffice to excuse demand on the board, the court does not address the merits of the individual defendants' motions to dismiss.

### A.     Legal Standards

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. Dismissal can be based on the "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988).  When evaluating a Rule 12(b)(6) motion, the court must accept all factual allegations in the complaint as true.  *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1955 (2007); *Barron v. Reich*, 13 F.3d 1370, 1374 (9th Cir. 1994).  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions." *Bell Atlantic Corp.*, 127 S. Ct. at 1964-65 (citations and edit marks omitted).  Moreover, "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Id.* (citations omitted).  The court is not required to accept conclusory legal allegations "cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).

"A shareholder seeking to vindicate the interests of a corporation through a derivative suit must first demand action from the corporation's directors or plead with particularity the reasons why such demand would have been futile." *In re Silicon Graphics Inc. Securities Litig.*, 183 F.3d 970, 989-90 (9th Cir. 1999) (citing Fed. R. Civ. P. 23.1).  The circumstances which make a demand futile are established by the laws of the state in which the corporation is incorporated. *Id.* at 990.  Finisar is incorporated in Delaware and, as such, the court turns to Delaware law to consider whether demand is excused.

**B.      Applicable Test for Demand Futility**

Two tests for demand futility are applied under Delaware law.  Where the challenged decision was made by the board of directors, demand is excused if the plaintiffs make particularized allegations raising a reasonable doubt that (1) a majority of the board of directors in place at the time of the complaint is disinterested and (2) the challenged acts were the product of the board's valid exercise of business judgment.  *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).  However, if the challenged decision was not a decision of the board of directors, the plaintiffs must create a reasonable doubt that the board of directors in place at the time of the complaint "could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales v. Blasband*, 635 A.2d 927, 934 (Del. 1993).  Such a situation occurs where the decision is made by a committee of the board rather than the full board.  *See id.*  However, where a majority of the full board sat on the committee at the time of the decision, the *Aronson* test still applies.  *Ryan v. Gifford*, 918 A.2d 341, 353 (Del. Ch. 2007).

In its previous order, the court held that the *Rales* test applies because plaintiffs failed to show that a majority of the Demand Board had served on the Compensation Committee during the time period for which alleged options backdating occurred.  *Finisar*, 542 F. Supp. 2d at 988-90. This decision turned on the fact that one of the members, Stephens, did not join the Compensation Committee until August 31, 2005, and there were no allegations of backdating beyond that point. *Id.*  It is now clear, however, that Finisar's internal investigation covered options granted from 1999 through 2006, which extends beyond the start of Stephens' service.[5]  Although the investigation report does not specify the dates of the grants that had to be remeasured, it is reasonable to infer that some of those grants happened after August 31, 2005.  Thus, the court will apply the *Aronson* test. Since the first prong of the *Aronson* test is the same as the *Rales* test, *MIPS*, 542 F. Supp. 2d at 975, the court's previous findings applying the *Rales* test remain relevant.

**C.      Director Independence and Disinterestedness**

Under the first prong of the *Aronson* test, plaintiffs must demonstrate that there is a

---

[5]  It also appears that some of the grants with incorrect measurement dates had been approved by the full board, although plaintiffs do not directly challenge those particular actions in the complaint.

United States District Court
For the Northern District of California

reasonable doubt that a majority of the board of directors are not disinterested and independent. *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004). Directors benefit from a presumption that they are faithful to their fiduciary duties. *Id.* at 1048-49. At the pleading stage, plaintiffs must rebut that presumption by alleging particularized facts creating a reasonable doubt that a director "could have acted independently in responding to the demand." *Id.* at 1049. "Independence is a fact-specific determination made in the context of a particular case." *Id.*

"A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." *Rales*, 634 A.2d at 936 (citing *Aronson*, 473 A.2d at 812). "Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Id.* In such circumstances, directors cannot be expected to consider a demand "without being influenced by the adverse personal consequences resulting from the decision." *Id.* "However, the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors, although in rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." *Aronson*, 473 A.2d at 815.

At the time this suit was filed, the Demand Board consisted of seven members: Rawls, Ferguson, Fries, Levinson, Mitchell, Stephens, and Trempont. For the purposes of this motion, defendants do not contend that Rawls is disinterested. Mot. Dismiss SAC of Nominal Def. Finisar Corp. at 2 n.1. Keeping in mind that the burden is on plaintiffs, the court finds that the admission in Finisar's Form 10-K that Rawls, as sole member of the Stock Plan Committee, retroactively selected more favorable grant dates is sufficient to raise a reasonable doubt that he is disinterested. Thus, to excuse demand, plaintiffs must show that three other members of the Demand Board were not disinterested and independent.

Plaintiffs allege that: (1) six of the seven Demand Board members received backdated stock options, (2) four of the directors (Ferguson, Fries, Mitchell, and Stephens) served on Finisar's Compensation Committee during the relevant period, (3) three of the directors (Ferguson, Mitchell,

**United States District Court**
For the Northern District of California

1    and Trempont) served on Finisar's Audit Committee during the relevant period, (4) all of the

2    directors benefitted from insider trading during the alleged backdating scheme, and (5) all of the

3    directors signed Finisar's SEC filings which contained alleged fraudulent statements regarding the

4    exercise price of stock option grants.  In short, plaintiffs allege that a majority of the directors

5    participated in or benefitted from an options backdating scheme.

6                    **1.       Allegations of Backdating**

7          Both the receipt and granting of backdated options render a director interested under the first

8    prong of the *Aronson* test.  Receiving backdated options means that a director received a benefit not

9    shared by the shareholders, and "[a] decision to correct the grants would have a detrimental impact

10   on the directors by removing a financial benefit they received."  *CNET*, 483 F. Supp. 2d at 958.

11   Knowingly approving backdated options qualifies as one of the "rare cases" described in *Aronson*

12   that create a substantial likelihood of director liability, *Ryan*, 918 A.2d at 355-56, and directors have

13   "a disabling interest for pre-suit demand purposes when 'the potential for liability is not a mere

14   threat but instead may rise to a substantial likelihood.'" *Id.* (quoting *In re Baxter Int'l, Inc.*

15   *Shareholders Litig.*, 643 A.2d 1268, 1269 (Del. Ch. 1999)).

16         At the pleading stage, "[t]he issue is whether plaintiffs have alleged circumstances from

17   which we may reasonably infer backdating as opposed to innocent bookkeeping error."  *CNET*, 483

18   F. Supp. 2d at 956.  In arguing that the SAC sets forth sufficient allegations that members of the

19   Demand Board received or granted backdated options, plaintiffs conflate several things: (1) incorrect

20   selection of measurement dates in a large number of option grants; (2) Finisar's admission that

21   certain employee grants were backdated by the Stock Plan Committee; and (3) backdating of option

22   grants made to directors and officers.  It is apparent from the SAC that the first two happened, but

23   that does not allow the court to infer the third.  Plaintiffs cannot bootstrap their allegations of

24   director backdating from the revelations in Finisar's Form 10-K.

25                    **a.       Finisar's Accounting Practices**

26         Finisar's Form 10-K admits that measurement dates were incorrectly selected for many of its

27   option grants.  Under Generally Accepted Accounting Principles ("GAAP"), the measurement date

28   of a stock option grant is defined as "the first date on which are known both: (1) the number of

ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS SECOND AMENDED COMPLAINT—06-07660 RMW
LJP                                                          11

United States District Court
For the Northern District of California

shares that an individual employee is entitled to receive and (2) the option or purchase price, if any."

*Accounting Principles Board Opinion No.* 25, "Accounting for Stock Issued to Employees" ("APB

25"). The Office of the Chief Accountant of the SEC issued a letter on September 19, 2006,

discussing companies' practices in selecting measurement dates with respect to APB 25. SAC ¶ 22

& Ex. C. Courts read this letter as identifying situations in which wrong measurement dates could

be the result of "sloppy accounting practices not rising to the level of fraud". *CNET*, 483 F. Supp.

2d at 955; *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1003-04 (N.D. Cal. 2007) ("Not

each and every single instance where a company has chosen the wrong measurement date is

necessarily a case of backdating.").

In particular, the letter noted that some companies were selecting measurement dates before

the date that all required granting actions were completed. SAC, Ex. C. For example, companies

might obtain oral authorization from the board of directors and complete the documentation at a later

date, or companies might delegate the authority to award options to a board member who determined

option awards and then obtained approvals at a later date. *Id.* The Office opined that "a conclusion

that a measurement date occurred before the completion of required granting actions must be

considered carefully," since it would be possible for a company to change the terms of a grant before

all granting actions were completed. *Id.* "If a company operated as if the terms of its awards were

not final prior to the completion of all required granting actions (such as by retracting awards or

changing their terms), the staff believes the company should conclude that the measurement date for

all of its awards (including those awards that were not changed) would be delayed until the

completion of all required granting actions." *Id.* The letter emphasized, however, that any

assessment of correctness of measurement dates depended heavily on the facts of each company and

could vary among different award categories depending on the company's practices with respect to

each award category. *Id.*

The SEC letter appears to describe exactly the informal practices used at Finisar: option

grants were recorded and measurement dates selected before all granting actions, such as execution

of UWCs, were completed. Without further allegations, such incidents would appear to amount to

no more than "innocent error–using an incorrect measurement date to price the options with no

**United States District Court**
For the Northern District of California

intent to find an advantageously low price." *CNET*, 483 F. Supp. 2d at 956.  Moreover, none of the grants by the Board of Directors or the Compensation Committee were found to have been modified after the originally selected measurement date, suggesting that although approval was only informal at that point, the details of each grant had been known with finality consistent with APB 25.

Plaintiffs suggest that grants with incorrect measurement dates were nonetheless in contravention of Finisar's stock option plans, which require that grants be at the fair market value of the stock on the effective date of the grant.  *See* Opp. to Mot. Dismiss of Nominal Def. Finisar Corp. at 18:23-28.  The court was unable to find anywhere in the SAC or its attached exhibits, including the text of the stock option plans, any definition of "effective date".[6]  It seems reasonable based on Finisar's practices to infer that the effective dates coincided with the originally selected measurement dates.  However, the fact that those measurement dates in retrospect were incorrect for accounting purposes[7] does not automatically render them improper effective dates for the purposes of the stock option plans.  *See CNET*, 483 F. Supp. 2d at 955-56 ("Some companies' stock options plans do not require that all administrative actions be completed before granting the options.").  Without more details, the court cannot conclude that any remeasured grants render the Demand Board interested.  Nor do plaintiffs specifically challenge those grants in their allegations of demand futility.

### b.     Admissions of Backdating

Unlike incorrect selection of measurement dates resulting from sloppy accounting, "[i]ntentionally employing hindsight to adjust the grant date to an advantageously low price, or 'backdating', is fraud."  *Id.* at 956.  In its Form 10-K, Finisar admitted that dates of some of the option grants made by the Stock Plan Committee, both to new hires and to current employees, had been selected retrospectively to achieve a more favorable price.  This amounts to an admission that backdating occurred at Finisar.  However, there is no allegation that directors other than Rawls had

---

[6]  In contrast, one of the remedial measures since adopted by Finisar specifies that the effective date of grants will be the later of the third trading day following the public announcement of financial results for the preceding quarter or the date of the meeting.  SAC, Ex. D at 48.

[7]  The court notes that the SEC's letter was issued on September 19, 2006, which is after the Review Period of the investigation.

knowledge that these grants were backdated or that they were in any way involved in approving of the grants.  Thus, these grants do not create a reasonable doubt that the other Demand Board members were not disinterested or independent.

### c.    Challenged Officer and Director Grants

Plaintiffs specifically challenge 12 grants to directors and officers.  Plaintiffs do not allege that any of these grants were among those that were found to have incorrect measurement dates. Plaintiffs allege that backdating of these grants may be inferred from (1) a "strong multi-year pattern of stock option grants to directors and officers on dates with highly favorable exercise prices – at or near a periodic low, or preceding a sharp increase in the share price" and (2) an application of the "Merrill Lynch analysis" to these grants.  SAC ¶¶ 89-91.

### i.    Alleged Pattern of Backdating

This court previously considered and rejected plaintiffs' argument that their allegations demonstrate a "strong multi-year pattern" in Finisar's officer and director grants.  *Finisar*, 542 F. Supp. 2d at 991-94.  Plaintiffs have not pleaded additional facts, aside from the Merrill Lynch analysis discussed below, that would support their argument that a pattern exists.  Rather, plaintiffs argue that, based on the fact that more than 50% of the 17 officer and director grants had favorable exercise prices by their definition, they are entitled to an inference that backdating occurred.  In response, defendants argue that four of the challenged grants have publicly available exculpatory explanations for their grant dates, and because less than 50% of the grants are problematic, all are relieved of suspicion.  Neither side explains the significance of this 50% benchmark.

If option dates were randomly selected, one would expect approximately 50% of the grant dates to coincide with the lower half of stock prices for that month.  When grants dates are alleged to be not just in the lower half but at or near the lowest price – at the second- or third-lowest, for example – then the fact that more than 50% of grants are involved may raise an inference that the dates are being retrospectively selected.  *Cf. In re Openwave Sys. Inc. Shareholder Derivative Litig.*, 503 F. Supp. 2d 1341, 1350 (N.D. Cal. 2007) (noting that one would expect a quarter of grants to fall on one of the five lowest trading days in a month if the dates were randomly selected). However, that does not apply to the group of grants plaintiffs challenge here.  The challenged grants

range in price from the lowest of the month to the highest.  Nine of the challenged grants, or just over 50%, had prices in the lower half of stock prices for their respective months.  This does not suggest a pattern of backdating.

In addition to grants made at periodic lows, plaintiffs include in their definition of suspect grants those preceding a sharp increase in stock price.  Reviewing the allegations and stock price graphs in the SAC, plaintiffs appear to refer to the grants on October 18, 2000, April 29, 2003, and August 31, 2005.[8]  Two of these grants coincide with events that explain both the grant dates and the sharp increases in stock price.  The grant on October 18, 2000, was made to Gregory Olsen, an executive officer.  SAC ¶ 94.  On the same day, Finisar announced the completion of its acquisition of Sensors Unlimited, Inc., which caused the stock price to rise from $30.88 on the grant date to $37.00 two days later.  *Id.*  Olsen joined Finisar in connection with the acquisition.  *Id.* ¶ 54.  Thus, it makes sense that the grant would coincide with the announcement.  *See CNET*, 483 F. Supp. 2d at 959 (finding suspicious a grant made several days before a press release and noting that "[i]f the grant date and the press release were contemporaneous in time, that could negate the near-doubling in the stock price").  Similarly, the August 31, 2005, grant was made to two incoming directors, Stephens and Trempont.  SAC ¶¶ 51-52, 103.  Finisar announced their election in a press release on August 2, and specifically disclosed that they would join the board on August 31, the date of the next scheduled meeting.  Banie Decl., Ex. C.  Both the fact that the grant coincided with their joining the board and the fact that the date was announced in advance weigh against an inference of backdating.  *Finisar*, 542 F. Supp. 2d at 989; *CNET*, 483 F. Supp. 2d at 960 ("Mere reliance on the numbers alone is not sufficient when plaintiffs are confronted with a legitimate, judicially-noticeable explanation for the grant date.").

Defendants do not offer any explanations for the date of the third grant, which was made on April 29, 2003, to one officer, non-defendant Fariba Danesh.  SAC ¶ 98.  This grant was made at the lowest share price for the month and the fiscal quarter.  *Id.*  For the preceding month, the stock price

---

[8]  These three grants exhibited large jumps in stock price within two days.  Most of the grants challenged by plaintiffs are alleged to have large 20-day gains in stock price, but the court does not consider an increase over 20 days (approximately a month, since plaintiffs are counting trading days) to be a "sharp increase" that raises suspicions of backdating.

1    had remained largely flat, but in the two days after the date of the grant, the price jumped sharply,

2    increasing from $0.76 to $1.29, and remained around that level for most of May.  *Id.*; Banie Decl.,

3    Ex. A.  Like all of the challenged grants, the grant date was selected in the discretion of the board

4    rather than at a fixed time specified in the stock option plan.  SAC ¶ 91.  While the court is reluctant

5    to infer backdating from looking at a single grant in isolation, these allegations appear sufficient to

6    meet plaintiffs' pleading burden.  *See CNET*, 483 F. Supp. 2d at 959-60.  In *CNET*, the court noted

7    that the grant had been made on a day that the stock was trading below its average for the year and

8    had not been made as part of an overall plan.  *Id.*  Under those circumstances, the court held that

9    "the sharp increase in stock price afterward is sufficient to eliminate the possibility that the grant

10   date was the product of blind chance."  *Id.*

11           Aside from the April 29, 2003, grant, the court does not see more than blind chance in the

12   grants challenged by plaintiffs.  Plaintiffs argue that these grants carry "indicia" of backdating, i.e.

13   the issuers had discretion to select the dates of issuance and, in some cases, the Form 4s disclosing

14   the grants to the SEC were filed late.  Opp. to Mot. Dismiss SAC of Nominal Def. Finisar Corp. at

15   10:23 to 11:8.  However, while the fact that grants are discretionary may make it easier for

16   backdating to occur, it does not support more than speculation that backdating is actually occurring.

17   Without a pattern of grants that already raise an inference of backdating, the discretionary nature of

18   Finisar's stock plan is not incriminating.  *See Ryan*, 918 A.2d at 354-55 (finding a pattern of timing

19   that "seems too fortuitous to be mere coincidence" and then noting "[t]he appearance of impropriety

20   *grows even more* when one considers the fact that the board granted options, not at set or designated

21   times, but by a sporadic method" (emphasis added)); *Zoran*, 511 F. Supp. 2d at 1005 (finding

22   sufficient allegations of backdating where nine of eleven discretionary grants were made at the

23   lowest or second-lowest prices of the month and all eleven were followed by sharp increases in

24   stock price).  Similarly, a late Form 4 has many explanations, one of which is backdating, but

25   standing alone it is insufficient to raise a reasonable inference that backdating occurred.  *Finisar*,

26   542 F. Supp. 2d at 994.

27                       **ii.      Plaintiffs' "Merrill Lynch Analysis"**

28

**United States District Court**
For the Northern District of California

1   In its previous order, the court criticized plaintiffs' failure to provide context for the 20-day

2   returns on the challenged grants, contrasting the bare allegations to the empirical evidence provided

3   by plaintiffs in *Ryan* and *Conrad v. Blank*, 940 A.2d 28 (Del. Ch. 2007).  *Finisar*, 542 F. Supp. 2d at

4   992-93.  Plaintiffs seek to remedy that in the SAC by providing a "Merrill Lynch analysis".  As

5   defendants point out, the analysis was not actually performed by Merrill Lynch.  Rather, plaintiffs

6   attempt to emulate the method used in Merrill Lynch's famous May 2006 report.  *See* SAC ¶ 90.

7   Plaintiffs' analysis compares the "annualized return for management" of each challenged

8   grant with the "annualized return for investors."  SAC ¶¶ 92-103.  From the numbers presented, it is

9   readily apparent that the "annualized return for management" is simply the 20-day return of each

10  option multiplied by 18, based apparently on the notion that 18 times 20 days is 360 – almost a year.

11  It is less clear how the "annualized return for investors" is derived; the court's best guess is that it

12  reflects investor returns over a fiscal year, as grants within the same fiscal year are compared to the

13  same number.  Plaintiffs allege that the Merrill Lynch analysis includes such a comparison but fails

14  to explain what a comparison is meant to reveal, i.e. what kinds of results are "a strong indicator of

15  whether backdating likely occurred."  SAC ¶ 90.  For example, it is unclear whether the court should

16  be considering the difference between the two numbers or the ratio – plaintiffs appear to believe it is

17  the difference.  Either way, it is also unclear what the threshold is for finding a grant suspicious.

18  Logic would dictate that, for any volatile stock, assuming a 20-day movement continues for the

19  entire year is unrealistic, and so the mere fact that the annualized management returns differ from

20  the investor returns is insufficient to suggest backdating.

21  A closer reading of *Ryan* is telling.  First, it becomes apparent that plaintiffs' method is not

22  the one accepted by that court.  The analysis performed in *Ryan* yielded a single number: "Merrill

23  Lynch found that the twenty-day return on option grants to management *averaged* 14% over the

24  five-year period, an annualized return of 243%, or almost ten times higher than the 29% annualized

25  market returns in the same period."  918 A.2d at 347 (emphasis added).  In other words, Merrill

26  Lynch looked at all of the option grants made in the period of alleged backdating, not only the

27  challenged grants as plaintiffs have done here.  Second, it underscores the importance of

28  understanding what the numbers tell us.  As explained in *Ryan*, "Merrill Lynch measured the

*aggressiveness* of timing of option grants by examining the extent to which stock price performance subsequent to options pricing events diverges from stock price performance over a longer period of time." *Id.* at 346 (emphasis added).  What aggressiveness means or when it would suggest backdating, seems to be something only Merrill Lynch would know.[9]

Untethered from Merrill Lynch's methodology, particularly its examination of all option grants, plaintiffs' analysis is essentially meaningless.  *See Openwave Systems*, 503 F. Supp. 2d at 1351 (rejecting plaintiffs' analysis because it only examined the 20-day returns of its "handpicked option grants" rather than the return on "*all* reported stock option grants during the relevant period").  A grant-by-grant comparison – as opposed to an average – is highly problematic.  First, it is extremely sensitive to the 20-day window, which appears to be an arbitrary number.  For example, if one used a 19-day window instead on the June 7, 2002, grant, the return would be negative 10.4% (i.e. the stock price had declined 10.4% since the June 7, 2002 grant date).  The annualized return, obtained by multiplying 10.4% by 365/19, would be negative 200%.  Suddenly, the grant no longer looks suspicious, but other "innocent" grants might.  This example is not to say that 19 days is more appropriate, but that the 20-day period is uninformative.  Second, the comparison is untethered to any realistic scenario of exercising the options.  Finisar options generally vested at 20% a year over five years.  SAC ¶ 86.  Thus, the 20-day gains bear no relationship to the profits, if any, management actually made.  Third, plaintiffs' method results in large blocks of time during which grants on *any* of those dates would be considered suspicious.  For example, two of the challenged grants were made during steady increases in stock price that lasted more than a month.  SAC ¶¶ 93, 102.  Any grant date selected in the early half of these increases would show large 20-day gains.  Yet these grants occurred at prices nowhere near the lows for the month or quarter.  That an analytical method would mark these grants as suspicious suggests that the method has strayed far indeed from the backdating modus operandi of retrospectively picking *low* prices.  Plaintiffs' analysis therefore does not support a reasonable inference of backdating.

---

[9]  In *Ryan*, plaintiffs had the benefit of Merrill Lynch's conclusion that "if backdating did not occur, management of Maxim was remarkably effective at timing options pricing events." *Id.* at 347.

1    To summarize, the court finds that plaintiffs have successfully pleaded that the April 29,

2  2003, grant was backdated, but the allegations are insufficient as to any other of the challenged

3  grants.  The April 29, 2003, grant was not made to any member of the Demand Board.  However,

4  Ferguson was a member of the Compensation Committee at the time of the grant.  Plaintiffs have

5  alleged that the Compensation Committee was responsible for reviewing and approving all option

6  grants to officers.  Under those circumstances, it is reasonable to infer that Ferguson would be aware

7  of the details of the April 29, 2003, grant and face a substantial likelihood of liability if the grant

8  proves to have been backdated.  *But cf. CNET*, 483 F. Supp. 2d at 965 (finding insufficient an

9  allegation that the directors served on the compensation committee where the committee had

10  authority to select grant dates but could delegate that authority to executive officers).  Thus,

11  plaintiffs have created a reasonable doubt that Ferguson is disinterested and independent.

12                      **2.    Audit Committee Membership**

13    Plaintiffs argue that members of the Audit Committee face a substantial likelihood of

14  personal liability because they were charged with reviewing Finisar's financial statements prior to

15  dissemination, and they caused Finisar to issue false financial statements during the period of

16  alleged backdating.  However, mere membership on the Audit Committee is insufficient to plead

17  demand futility.  *Desimone v. Barrows*, 924 A.2d 908, 942 (Del. Ch. 2007) ("the fact that Sycamore

18  accounted for the backdated options grants incorrectly does nothing to suggest any conscious

19  wrongdoing on the part of the Audit Committee"); *In re Computer Scis. Corp. Derivative Litig.*,

20  2007 WL 1321715, at *9 (C.D. Cal. Mar. 26, 2007) (requiring more than a listing of membership

21  and recitation of committee duties under the company's bylaws).  Plaintiffs must plead with

22  particularity facts "that provide a basis for inferring knowledge on the Audit Committee's part of

23  options backdating."  *Desimone*, 924 A.2d at 942; *MIPS*, 542 F. Supp. 2d at 978.  In addition,

24  plaintiffs cannot impute knowledge from one board member to other board members as a result of

25  their shared board or committee service.[10]  *Id.*  Plaintiffs have failed to plead any facts regarding the

26  _____

27  [10]  Plaintiffs misread *Ryan* on this point.  Opp. to Mot. Dismiss of Nominal Def. Finisar Corp. at
   17:2-4 (citing *Ryan*, 918 A.2d at 353).  *Ryan* imputed *approval of a transaction* to the entire board
28  where the transaction had already been approved by a committee that consisted of a majority of the
   board members.  *Ryan*, 918 A.2d at 353 (discussing applicability of the *Aronson* test for demand

1  Audit Committee members' knowledge of alleged backdating, aside from Ferguson as discussed

2  above.

futility).

United States District Court
For the Northern District of California

1

### 3. Insider Trading

Plaintiffs allege that all of the directors benefitted from insider trading during the period of alleged backdating. The court already considered and rejected this argument for failure to allege "any connection between the directors' inside sales and the alleged backdating." *Finisar*, 542 F. Supp. 2d at 996 (citing *In re Verisign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1191-92 (N.D. Cal. 2007)). Plaintiffs have not amended their complaint with respect to those allegations since then.

### 4. False Financial Filings

Plaintiffs argue that all of the directors face a substantial likelihood of personal liability because they signed one or more of Finisar's financial statements filed with the SEC between 2000 and 2006, which had to be restated. But boilerplate allegations that directors signed SEC filings do not meet the particularized pleading requirements for demand futility. *In re BEA Sys. Derivative Litig.*, 2009 U.S. Dist. LEXIS 30864, at *14 (N.D. Cal. Mar. 27, 2009); *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995). As with plaintiffs' other generalized bases for demand futility, they have failed to plead facts that would allow the court to infer knowledge on the part of the directors that the financial statements were false.

### D. Business Judgment Rule

The second prong of the *Aronson* test asks whether there is a reasonable doubt that the board's challenged decisions were the proper exercise of business judgment. 473 A.2d at 812. Plaintiffs' allegations that the Demand Board did not exercise business judgment all rely on the premise that the Demand Board granted backdated options. SAC ¶¶ 239-44 (alleging for example that such conduct is *ultra vires*). As discussed above, plaintiffs have not sufficiently alleged that the board was involved in granting any backdated options, so their allegations regarding lack of business judgment necessarily fail.

Thus, the court concludes plaintiffs have failed to plead with particularity that a majority of the board was not disinterested or independent or did not exercise business judgment in making decisions under *Aronson*.

United States District Court
For the Northern District of California

**E.      Investigation Results**

In their papers, plaintiffs argue that demand would be futile since, despite admissions of backdating, the Audit Committee has declined to take any action to hold any individuals accountable.  The court in *Desimone* rejected such an argument, finding that it sought to bypass the failure to plead demand futility after choosing not to make a demand.  924 A.2d at 950 ("A derivative plaintiff cannot fail to make a demand on the basis that demand is excused, fail to meet his burden to plead demand excusal, and then try to preserve his right to proceed by arguing in essence that the board wrongfully refused a demand that he never made.").

Plaintiffs cite *Conrad*, but *Conrad* did not rely on the company's investigation report to overcome a failure to plead demand futility.  Rather, *Conrad* found that two directors had received backdated options and three directors faced a substantial likelihood of liability in granting those options, creating a reasonable doubt that a majority of the directors were disinterested.  940 A.2d at 38, 40-41.  Moreover, *Conrad* criticized the investigation results for its lack of detail, saying that "other than the grossest generalities," the findings "have been carefully hidden from both the stockholders and the court."  *Id.* at 37.  In contrast, Finisar described its investigation and its results in extensive detail, including explanations of why measurement dates had been incorrectly selected and how they were remeasured.  *See also In re Autodesk, Inc., Shareholder Derivative Litig.*, 2008 WL 5234264, *7-*9 (N.D. Cal. Del. 15, 2008) (distinguishing *Conrad*).  Finisar has also adopted remedial measures in light of its investigation.  Given Finisar's openness, and heeding the warning of *Desimone*, the court does not find that Finisar's investigation results provide a basis for inferring demand futility.

**F.      Leave to Amend**

Plaintiffs were previously granted leave to amend their First Amended Complaint to incorporate the final results of Finisar's internal investigation, which were disclosed in its December 4, 2007, Form 10-K.  While shedding more light on the options granting and accounting practices that went on at Finisar during the relevant period, plaintiffs have still failed to plead with particularity that demand is excused.

1    "Dismissal without leave to amend is improper unless it is clear that the complaint could not

2    be saved by any amendment." *Polich v. Burlington Northern, Inc.*, 942 F.2d 1467, 1472 (9th Cir.

3    1991).  Where the plaintiff fails to set forth any additional facts that could save the complaint,

4    however, dismissal with prejudice is appropriate.  *Silicon Graphics*, 183 F.3d at 991; *accord In re*

5    *VeriFone Securities Litig.*, 11 F.3d 865, 872 (9th Cir. 1993).  In *Silicon Graphics*, the court upheld

6    the dismissal with prejudice of a derivative shareholder suit for failure to excuse demand when the

7    plaintiff failed to set forth any facts he could add to the complaint.  183 F.3d at 991.  Similarly,

8    plaintiffs here have not suggested in their papers what new facts they could plead to save their

9    complaint.

10    As shareholders, plaintiffs have "discovery tools unavailable to the traditional plaintiff,

11    namely, [the] ability to inspect corporate books and records."  *MIPS*, 542 F. Supp. 2d at 979-80

12    (citing 8 Del. C. § 220; *Melzer v. CNET Networks, Inc.*, 934 A.2d 912, 916-20 (Del. Ch. 2007)).  Yet

13    after multiple complaints plaintiffs have failed to allege specific details about backdating at Finisar.

14    Moreover, the SAC was filed almost a year and a half after the start of this litigation.  In *CNET*, the

15    court found that nine months gave plaintiffs "ample opportunity to investigate their allegations."

16    483 F. Supp. 2d at 967.  In light of these circumstances, denial of leave to amend is appropriate.

17                                       **III.  ORDER**

18    For the foregoing reasons, the court GRANTS defendants' motions to dismiss.  Plaintiffs'

19    Second Amended Complaint is dismissed without leave to amend.

20

21

22    DATED:        09/22/09                            _Ronald M Whyte_____

23                                                      RONALD M. WHYTE
                                                        United States District Judge

24

25

26

27

28

**United States District Court**
For the Northern District of California

1

**Notice of this document has been electronically sent to:**

2

**Counsel for Plaintiffs:**

3
Aelish Marie Baig              AelishB@csgrr.com
Travis E. Downs, III           travisd@csgrr.com
4
Lester Rene Hooker             lhooker@saxenawhite.com
Alan Roth Plutzik              aplutzik@bramsonplutzik.com
5
Seth Adam Safier               seth@gutridesafier.com
Shawn A. Williams              shawnw@csgrr.com
6
Monique C. Winkler             shawnw@csgrr.com

7

**Counsel for Defendants:**

8

9
David Banie                    david.banie@dlapiper.com
Arlena Victoria Carrozzi       arlena.carrozzi@dlapiper.com
David M. Doyle                 david.doyle@dlapiper.com
10
Lawrence T. Hoyle , Jr.        lhoyle@hoylelawfirm.com
David Allen Priebe             david.priebe@dlapiper.com
11
Shirli Fabbri Weiss            shirli.weiss@dlapiper.com
Lloyd Winaer                   lwinawer@goodwinprocter.com

12

13

14
Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

15

16
**Dated:** _____09/22/09_____                    _____JAS_____
17
                                                      **Chambers of Judge Whyte**

18

19

20

21

22

23

24

25

26

27

28