**United States District Court**
For the Northern District of California

1
2
3
4          **E-FILED on** _____7/12/12
5
6
7
8                IN THE UNITED STATES DISTRICT COURT
9              FOR THE NORTHERN DISTRICT OF CALIFORNIA
10                      SAN JOSE DIVISION
11

| | |
|---|---|
| In re FINISAR CORP. DERIVATIVE LITIGATION | No. C-06-07660 RMW |
| _____ | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS SUPPLEMENTAL SECOND AMENDED COMPLAINT |
| This Document Relates To: | |
|    ALL ACTIONS. | |

12
13
14
15
16
17
18
19
20        Plaintiffs City of Worchester Retirement System, Lynn Short, James Rocco, and Robert
21   Lynch ("plaintiffs") bring this derivative suit on behalf of nominal defendant Finisar Corporation
22   ("Finisar") against certain current and former directors and officers of Finisar.  Individual defendants
23   Jerry Rawls, Michael Child, Roger Ferguson, Frank Levinson, Robert Stephens, Dominique
24   Trempont, David Fries, Harold Hughes and Gregory Olsen (the "Director Defendants"); and David
25   Buse, John Drury, Mark Farley, Jan Lipson, Stephen Workman, and Joseph Young (the "Officer
26   Defendants") (collectively "Individual Defendants" or "Defendants") move to dismiss the
27   Supplemental Second Amended Complaint ("SSAC") under the Private Securities Litigation Reform
28   Act of 1995 ("PSLRA") and Federal Rules of Civil Procedure 9(b) and 12(b)(6).  The court has read

1   the papers and considered the arguments of counsel.  For the reasons set forth below, the court

2   grants in part and denies in part defendants' motions to dismiss.

### I. FACTUAL ALLEGATIONS[1]

4        Finisar is a technology company headquartered in Delaware and based in Sunnyvale,

5   California.  SSAC ¶ 42.  In 2006, Finisar announced that accounting errors related to its granting of

6   stock options would require a substantial restatement of the company's profits for fiscal years 2000

7   to 2006 (the "relevant period").  Plaintiffs subsequently filed the instant action, asserting that

8   Finisar's directors and officers violated federal securities and state laws by manipulating option

9   grants–a now-familiar practice known as "backdating"–and making false statements in SEC filings

10  and press releases.  SSAC ¶¶ 2, 10.  Plaintiffs also allege that defendants engaged in illegal insider

11  trading, "pocket[ing] hundreds of millions of dollars in excessive compensation" and causing

12  financial and reputational harm to the company.  *Id.* ¶ 9.

### A.    Background

14       As is common in Silicon Valley, Finisar often granted stock options to directors, officers and

15  employees as part of their compensation packages.  *Id.* ¶ 42; 83.  Such options allow the recipient to

16  buy shares of stock at a set price, called the "exercise price" or "strike price," on a specified future

17  date.  *Id.*  A stock option is "in-the-money" when its exercise price exceeds the public trading price

18  on the date of the grant.  *Id.*  The option is "at-the money" when its exercise price and public trading

19  price on the date of the grant are the same.  *Id.*

20       For several months following the company's initial public offering in November 1999,

21  Finisar's Board of Directors approved all stock option grants.  *See* SSAC, Ex. D (Finisar's Form 10-

22  K filed Dec. 4, 2007) ("Investigation Report") at 49.[2]  In February 2000, the Board of Directors

---

[1]      Additional facts relating to this litigation may be found in this court's previous orders, *In re Finisar Corp. Derivative Litig.*, 541 F. Supp. 2d 980, 982-87 (N.D. Cal. 2008); and *In re Finisar Corp. Derivative Litig*, No. 06-07660 RMW, 2009 U.S. Dist. Lexis 94002, at *4-16 (N.D. Cal. Sept. 22, 2009).

[2]      As the Ninth Circuit noted in its order remanding this action, plaintiffs need not rely on, and the court need not accept as true, portions of Finisar's 2007 10-K Report which are "self-serving" and "self-exonerating."  Dkt. No. 107 at 4 n. 1.  However, while the court will not unquestioningly assume the accuracy of the report, it will consider its contents under the incorporation by reference

**United States District Court**
For the Northern District of California

1    established a "Stock Plan Committee" comprised solely of defendant Rawls, the company's CEO, to

2    grant options to most newly hired and existing non-officer employees.  *Id.* at 49.

3            In addition to the Stock Plan Committee, Finisar's Board of Directors also included an Audit

4    Committee and a Compensation Committee.  SSAC ¶ 60.  The Audit Committee was responsible for

5    financial oversight of the company.  *Id.* ¶¶ 62-63.  The Compensation Committee was responsible

6    for (1) reviewing and approving all compensation and benefits for executive officers and (2)

7    developing and reviewing general policies relating to compensation and benefits for employees.  *Id.*

8    ¶¶ 65-67.  After the establishment of the Stock Plan Committee, the Compensation Committee

9    generally approved stock option grants to existing executive officers, either at a meeting or by

10   unanimous written consent ("UWC").  Investigation Report at 49-50.  The Board of Directors had

11   sole authority to grant options to employees as part of an acquisition or merger, and to approve

12   options granted to directors.  *Id.* at 49.

13           During the relevant period, Finisar's Stock Incentive Plans required the exercise price of any

14   option grant to be "not less than the Fair Market Price of a share of Stock on the effective date of the

15   grant of the Option."  *Id.* ¶¶ 84-85.[3]  Consistent with this policy, Finisar filed annual Form 14-A

16   proxy statements with the SEC indicating that: "Stock options are granted at an exercise price equal

17   to the market price of our Common Stock on the date of the grant and will provide value to the

18   executive officers only when the price of our Common Stock increases over the exercise price."  *See*

19   *id.* ¶¶ 111-158.  The company also filed Forms 10-K each year stating that Finisar accounted for

20   stock option grants in accordance with Accounting Principles Board Opinion No. 25 ("APB 25"),

21   which generally requires the recognition of a compensation expense only when stock options are

22

23

24   doctrine in evaluating competing inferences relevant to plaintiffs' PSLRA claims.  *See Tellabs, Inc.*

25   *v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007) (in evaluating a PLSRA claim "courts
     must consider the complaint in its entirety, as well as other sources courts ordinarily examine when

26   ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint
     by reference, and matters of which a court may take judicial notice.").

27

28   [3]      The Plans did not define "effective date" or otherwise specify how the "date of the grant"
     was to be calculated.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS SUPPLEMENTAL SECOND
AMENDED COMPLAINT—06-07660 RMW
EDM                                              3

granted "in-the-money." *See id.* ¶¶ 107; 165; 185-218.[4]  In addition, between 2003 and 2006, the company submitted certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") affirming that the information contained in the Forms 10-K was accurate. *Id.* ¶¶ 13-14.

**B.      Finisar's Internal Investigation**

On November 30, 2006, amidst substantial publicity highlighting the practice of backdating at publicly-traded companies, Finisar announced that it was conducting an internal investigation of its options-granting practices from 1999 through 2006 (the "Review Period"). *Id.* ¶ 220.  The investigation was led by members of the Audit and Compensation Committees, with the assistance of independent counsel and forensic accountants.  Investigation Report at 45.  The company indicated that based on preliminary results, it was probable that the measurement dates for certain stock option grants were incorrectly recorded.  SSAC ¶ 220.  Finisar further noted that it would likely need to revise its financial statements for fiscal years ending April 30, 2001 and thereafter, and that those statements should not be relied upon. *Id.*

On June 12, 2007, Finisar announced the initial findings of its investigation. *Id.* ¶ 226.  The company's press release indicated that "a deficient and poorly documented [option grant] process as well as a lack of attentiveness and a lack of thorough understanding of relevant accounting rules" resulted in "a few instances where grants were delayed and a more favorable price resulted from the delay, and a few instances where a more favorable price was selected retrospectively for a grant." *Id.*       On December 4, 2007, Finisar released its final report, which was incorporated into its 2007 10-K filing.  The report confirmed that the company "previously used incorrect measurement dates when accounting for stock option grants pursuant to APB 25." *Id.* ¶ 229.  It acknowledged that in the case of two grants, the grant date was "selected retrospectively to capture a more favorable price." *Id.*  In total, the report found that measurement dates for "105, or 70%, of the 151 Granting Actions during the Review Period" would need to be restated to record charges for compensation

---

[4]      Under APB 25, the compensation cost of an option is measured by the difference between the exercise price and the market price of the underlying share at the "measurement date," which is defined as "the first date on which are known both (1) the number of shares that an individual is entitled to receive and (2) the option or purchase price, if any..."  SSAC ¶ 107.

United States District Court
For the Northern District of California

1    expenses relating to such option grants. *Id.* The restatement yielded approximately $112 million in

2    additional compensation expenses between fiscal years 2000 and 2006. *Id.*

3          Despite these findings, the investigation concluded that there was "no evidence of

4    intentional misconduct or malfeasance on the part of Company personnel involved in selecting and

5    approving the grant dates or administering the stock option granting process." Investigation Report

6    at 48. Instead, the report blamed "process-related deficiencies." *Id.* For example, the report found

7    that many grants made by the Stock Plan Committee, including grants to new hires and annual

8    performance grants, were based on grantee lists that were changed after the approved grant date. *Id.*

9    at 51, 53. Similarly, for some grants to directors and officers made by UWC, the UWCs were

10   deemed effective as of a date earlier than the date the UWC was signed by the directors, although

11   the UWCs had been sent to the directors on the effective date. *Id.* at 55. Also, some acquisition-

12   related grants, which were approved by the Board of Directors, were recorded with a grant date that

13   was different than the date specified in the acquisition documents. *Id.* at 54.

14         The report further noted that none of the past or present members of the Board of Directors

15   or the CEO received any grants for which the measurement date was ultimately revised, with one

16   exception. *Id.* at 46. In that grant, made to two directors, the exercise price was higher on the date

17   the option was recorded than on the correct date, so no additional compensation expense was

18   recognized. *Id.* at 46, 55.

19   **C.    Allegedly Backdated Officer and Director Grants**

20         Notwithstanding the fact that Finisar did not revise the measurement date for grants made to

21   officers or directors, plaintiffs contend that 12 out of the 17 grants made to such individuals during

22   the relevant period were intentionally backdated. *Id.* ¶ 92. Specifically, plaintiffs challenge three

23   grants made in 2000, two in 2001, one in 2002, four in 2003, one in 2004 and one in 2005. *Id.* ¶¶

24   93-104. Plaintiffs first note that officer and director grants were not made at the same time each

25   year, and that the issuers had discretion to select the grant date. *Id.* Plaintiffs then allege that the

26   twelve challenged grants, which consist of more than 50% of the total number of stock options

27   granted to officers and directors during the relevant period, "were dated: (i) near or on the very day

28   that Finisar stock hit its low price for the month; or (ii) in advance of sharp stock price increases."

*Id.* ¶ 89.  According to plaintiffs, "this strong multi-year pattern of stock option grants to directors and officers on dates with highly favorable exercise prices ... indicates that the purported grant dates of stock options were not the actual dates on which the option grants were made." *Id.* ¶ 90.

Plaintiffs also analyzed the twelve grants using a "Merrill Lynch analysis."  SSAC ¶¶ 93-105.  Merrill Lynch developed "a method of analyzing options grants and comparing the returns from such grants to the average investor returns in the same period as a strong indicator of whether backdating likely occurred." *Id.* ¶ 90.  "The analysis . . . calculates the annualized return of the option grants at twenty days after the grant and compares that annualized return with the company's overall annual return." *Id.* ¶ 91.  According to plaintiffs' application of this method, the challenged grants resulted in annualized management and director returns from around 200% to more than 3000%, while the annualized return for average investors was much smaller, and often negative. *Id.* ¶¶ 93-105.  Plaintiffs further allege that the Forms 4 for each option grant were filed anywhere from several months to more than a year after each grant was purportedly issued. *See, e.g.*, *id.* ¶ 93.[5] Those factors, plaintiffs argue, indicate that the grants were "very likely to have been backdated." *Id.* ¶ 92.

**D.     Allegations against Individual Defendants**

     **1.     Director Defendants**

          **i.     Rawls**

Rawls was a director and CEO of Finisar throughout the relevant period, and Chairman of the Board as of January 2006. *Id.* ¶ 43.  Plaintiffs allege that Rawls received "at least 2.5 million suspicious options." *Id.*  Plaintiffs identify two specific grants–1,000,000 shares issued on June 7, 2002 and 200,000 shares issued on August 27, 2003–which preceded "sharp" increases in the stock price. *Id.* ¶¶ 98; 100.  According to plaintiffs' Merrill Lynch analysis, these grants yielded annualized returns that were respectively 314% and 507.7% better than the returns obtained by average investors. *Id.*  Rawls also signed Finisar's Forms 10-K from 2000 to 2006 and SOX

---

[5]     When transacting in their own company's stock, directors and officers must file records of any changes in beneficial ownership by filing a Form 4 with the SEC.  Since the enaction of the Sarbanes-Oxley Act in July 2002, a Form 4 must be filed before the end of the second business day after the transaction took place. *See* 15 U.S.C. 78p(a)(2)(C).

**United States District Court**
For the Northern District of California

certifications from 2003 to 2006. *Id.* In addition, as the sole member of the Stock Plan Committee and a member of the Board of Directors, he approved a substantial portion of the employee grants that ultimately required accounting revision, and all of the director grants. *See* Investigation Report at 51.

### ii.      Levinson

Levinson was Chairman of the Board and CTO from August 1999 to December 2005. Plaintiffs allege that he received grants of 1,000,000 shares on June 7, 2002 and 100,000 shares on August 27, 2003, each of which preceded "sharp" increases in the stock price, and a total of 1.6 million shares during the relevant period. SSAC ¶¶ 98;100. According to plaintiffs' Merrill Lynch analysis, these grants yielded annualized returns that were respectively 314% and 507.7% better than the returns obtained by average investors. *Id.* Levinson also signed Finisar's Forms 10-K from 2000 to 2006. *Id.* ¶ 48. In addition, he allegedly sold 12 million shares of Finisar stock during the relevant period for proceeds of $98 million. *Id.*

### iii.      Ferguson

Ferguson was a director, member of the Compensation Committee and Chairman of the Audit Committee throughout the relevant period. *Id.* ¶¶ 49; 70. Ferguson allegedly received a grant of 20,000 shares on June 7, 2002 which preceded a "sharp" increase in the stock price, and a total of 60,000 shares during the relevant period. *Id.* ¶¶ 49; 98. According to plaintiffs' Merrill Lynch analysis, the June 7, 2002 grant yielded an annualized return that was 314% better than the return obtained by average investors. *Id.* He also signed Finisar's Forms 10-K from 2000 to 2006. *Id.* ¶ 49. Further, he sold 40,000 shares of Finisar stock during the relevant period for proceeds of $431,833. *Id.*

### iv.      Fries

Fries became a Finisar director and Chairman of the Compensation committee in June 2005. *Id.* ¶ 50. During the relevant period, Fries allegedly received grants of at least 50,000 options. He also signed Finisar's SEC filings in 2005 and 2006. *Id.*; *Id.* ¶¶ 214; 218.

### v.      Mitchell

United States District Court
For the Northern District of California

Mitchell was a director throughout the relevant period, a member of the Audit Committee from 2001-2006, and a member of the Compensation Committee from 2004-2006.  *Id.* ¶¶ 51; 70.  He signed the company's Forms 10-K from 2000-2006 and allegedly received grants of 60,000 options during the relevant period.  *Id.*[6]

### vi.     Stephens

Stephens became a Finisar director and a member of the compensation committee in August 2005.  *Id.* ¶ 52.  He signed the company's 2006 Form 10-K, received a grant of 30,000 shares on August 31, 2005–the date on which the stock price was the fifth lowest for the entire year–and a total of at least 50,000 options during the relevant period.  *Id.* ¶¶ 52; 103.

### vii.    Trempont

Trempont became a Finisar director and a member of the Audit Committee in August 2005.  *Id.* ¶ 52; 70.  He signed the company's 2006 Form 10-K, received a grant of 30,000 shares on August 31, 2005–the date on which the stock price was the fifth lowest for the entire year–and a total of at least 50,000 options during the relevant period.  *Id.* ¶¶ 52; 103.

### viii.   Child

Child was a Finisar director from 1998-2005 and a member of the Compensation and Audit Committees from 2000-2005.  He signed the company's Forms 10-K from 2000 to 2005. *Id.* ¶ 54.  He allegedly received at least 10,000 options during the relevant period.  *Id.*  In addition, TA Associates, Inc., a venture capital firm of which Child is managing director, purportedly exercised more than 33 million options of Finisar stock for proceeds of over $700 million during the relevant period.  *Id.*

### ix.     Olsen

Olsen was a Finisar director from 2000 to 2002.  *Id.* ¶ 55.  He was granted 300,000 options on October 18, 2000, the same day Finisar announced its acquisition of Sensors Unlimited, Inc., a company Olsen had founded.  *Id.*  In December 2000, Olsen allegedly sold more than 2.7 million shares of Finisar stock for proceeds of over $78 million.  *Id.*  He also signed Finisar's Forms 10-K

---

[6]     At oral argument, defendants indicated that Mitchell has recently passed away.  No motion to dismiss has been filed on his behalf.  It appears that a representative must be appointed for him.

from 2000 to 2002. *Id.*

According to the SSAC, the directors' committee membership during the relevant period is summarized as follows:

|         | Compensation Committee              | Audit Committee                       |
|---------|-------------------------------------|---------------------------------------|
| FY00    | Child, Ferguson                     | Child, Ferguson                       |
| FY01    | Child, Ferguson                     | Child, Ferguson, Mitchell             |
| FY02    | Child, Ferguson                     | Child, Ferguson, Mitchell             |
| FY03    | Child, Ferguson                     | Child, Ferguson, Mitchell             |
| FY04    | Child, Ferguson, Mitchell           | Child, Ferguson, Mitchell             |
| FY05    | Child, Ferguson, Mitchell           | Child, Ferguson, Mitchell             |
| FY06    | Ferguson, Mitchell, Fries, Stephens | Ferguson, Mitchell, Trempont          |

*Id.* ¶ 70.[7]

## 2.    Officer Defendants

### i.    Workman

Workman was Finisar's CFO and Secretary throughout the relevant period, and became Senior Vice President of Finance in 2002. *Id.* ¶ 44.  He received grants of 65,000 options on June 15, 2000 and 200,000 options on June 7, 2002, each before "sharp" increases in the stock's price.  He also received 100,000 options on October 10, 2001–the eighth lowest price of the year. *Id.* ¶¶ 93; 97-98.  According to plaintiffs' Merrill Lynch analysis, these grants yielded annualized returns that were respectively 1100%, 314% and 3900% better than the returns obtained by average investors. *Id.*  In total, Workman was granted 440,000 options during the relevant period. *Id.* ¶ 44.  He signed Finisar's Forms 10-K from 2000 to 2006 and its SOX certifications from 2003 to 2006. *Id.*  In addition, he signed each of the proxy statements issued between 2000 and 2006 "by order of the Board." *See, e.g.*, *id.* ¶ 119.  In addition, Workman allegedly sold 124,199 shares of Finisar stock during the relevant period for proceeds of more than $3.5 million. *Id.* ¶ 44.

## II. PROCEDURAL HISTORY

## A.    This Court's Previous Orders

---

[7]     "FY00" stands for fiscal year 2000, which encompasses the period from April 1999 to April 2000.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Plaintiffs filed the instant action on December 14, 2006. *See* Dkt. No. 1. Plaintiffs amended

2    their complaint on March 8, 2007 and again on July 12, 2007. *See* Dkt. Nos. 17, 25. On January 11,

3    2008, the court issued an order granting Finisar and the Individual Defendants' motions to dismiss

4    with leave to amend, finding that plaintiffs had failed to adequately allege that a demand on Finisar's

5    Board–which then consisted of defendants Rawls, Ferguson, Fries, Levinson, Mitchell, Stephens,

6    and Trempont (the "Demand Board")–would have been futile. Dkt. No. 49. On September 22,

7    2009, the court dismissed the SSAC with prejudice after concluding that plaintiffs had still failed to

8    adequately allege demand futility. Dkt. No. 100. In that order, the court analyzed each challenged

9    grant individually and found that plaintiffs had shown that only one–the April 29, 2003 grant to non-

10   defendant Fariba Danesh–was backdated. *Id.* at 19. The court also criticized plaintiffs' application

11   of the "Merrill Lynch analysis," concluding that because plaintiffs considered annualized returns on

12   only the challenged grants rather than all grants made during the relevant period, the analysis did

13   "not support a reasonable inference of backdating." *Id.* at 18. The court did not reach the individual

14   defendants' separate motions to dismiss for failure to state a claim.

15   **B.    The Remand Order**

16   On April 26, 2011, the Ninth Circuit reversed. Dkt. No. 107. The Court of Appeal

17   highlighted plaintiffs' allegations that: (1) 12 of 17 director grants were dated near or on the day that

18   Finisar hit its low stock price or in advance of sharp increases; (2) Finisar admitted to incorrectly

19   dating 105 of 151 options; (3) the investigation committee, which included some of the same

20   directors alleged to have backdated options, offered a vague, unsupported conclusion that there was

21   no malfeasance; (4) the board took no steps to recover its substantial losses; (5) the "Merrill Lynch

22   type analysis" showed substantially higher annual yields for defendants' grants over average

23   investors; and (5) the Forms 4 disclosing the challenged grants were filed months or even more than

24   a year late, allowing "ample opportunity for mischief." *See Lynch v. Rawls*, 429 Fed. Appx. 641,

25   643-44 (9th Cir. 2011). Applying Delaware law, the Ninth Circuit found that this court "erred when

26   it engaged in extensive, fact-based examination and criticism of plaintiffs' proffered statistical

27   analysis, as well as criticism of the use of the Merrill Lynch type analysis in general." *Id.* at 644.

28   The court concluded that "because plaintiffs 'point[ed] to specific grants, specific language in option

**United States District Court**
For the Northern District of California

plans, specific public disclosures, and supporting empirical analysis to allege knowing and

purposeful violations of shareholder plans and intentionally fraudulent public disclosures,' and these

alleged facts *both* raised a reason to doubt the disinterestedness of most or all of the [demand] board

*and* indicated that the business judgment rule would not apply, plaintiffs 'provide[d] sufficient

particularity in the pleading to survive a motion to dismiss for failure to make demand pursuant to

Rule 23.1.'" *Id.* (quoting *Ryan v. Gifford*, 918 A.2d 341, 355 (Del. Ch. 2007)) (emphasis in original).

The Court of Appeal thus remanded the action for further proceedings.  Accordingly, this

court now considers the merits of the individual defendants' motions to dismiss.[8]

### III. ANALYSIS

**A.    FEDERAL CLAIMS**

#### 1.        Section 10(b) claims

To state a claim under § 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934 (the

"Exchange Act"), plaintiffs must allege (1) a material omission or misrepresentation, (2) scienter, (3)

a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss

causation.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005). A plaintiff's pleading of a §

10(b) claim must meet the particularity requirements of Fed. R. Civ. P. 9(b) and the PSLRA.  *In re

Daou Sys. Inc. Sec. Litig.*, 411 F.3d 1006, 1014 (9th Cir. 2005).

The SSAC alleges that each of the director defendants and Workman violated Section 10(b)

by making false and misleading representations in the company's Forms 10-K, SOX certifications

and proxy statements.  Unlike a typical 10(b) claim, because this is a derivative suit, plaintiffs must

show that the victim of such fraudulent statements is the corporation itself.  In essence, plaintiffs

allege that because of the backdating, defendants misrepresented to Finisar that stock options were

being granted at fair market value and that the options were being accounted for properly.  Finisar

then relied on these misrepresentations in making stock-option grants to officers and directors.  It

---

[8]        In their opposition motion, plaintiffs offer to dismiss without prejudice their claims against
the remaining officer defendants, Buse, Drury, Farley, Lipson and Young, and director defendant
Hughes.  Plaintiffs have had three opportunities to amend their complaint in the face of two rounds
of motions to dismiss, but have provided few, if any, additional allegations against these defendants.
The court finds that litigation against these individuals should be put to rest, and thus grants their
motions to dismiss with prejudice.

**United States District Court**
For the Northern District of California

suffered harm because those options should have fetched the higher price associated with the true

grant date, and because the scheme subjected the company to investigative costs and potential

liability, damaged its credibility, and forced the restatement of $112 million in compensation costs.

*See* SSAC ¶ 9; *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1011 (N.D. Cal. 2007)

(noting that Section 10(b) may cover such claims).

Defendants argue that most of plaintiffs' claims are time-barred, and that the remainder of

their allegations–particularly those regarding scienter–are inadequately pled.  The court will

consider each argument in turn.

### i.      Statute of Limitations

Under the Sarbanes–Oxley Act, claims for violations of § 10(b) may not be brought more

than five years after the date of the violation.  28 U.S.C. § 1658(b)(2).  The five-year period is a

statute of repose, meaning that equitable tolling is unavailable.  *See In re Zoran*, 511 F. Supp. 2d at

1013–14.  Each false representation constitutes a separate violation of § 10(b), such that the

five-year period begins to run with respect to each violation when it occurs.  *Id.* at 1014.  Where the

alleged wrong is options backdating, the violation occurs at the time the backdated option grant is

made.  *In re Silicon Storage Tech. Inc.*, No. 06-4310 JF, 2009 U.S. Dist. LEXIS 58705, at *12 (N.D.

Cal. July 7, 2009); *see also In re Affiliated Computer Servs. Deri. Litig.*, 540 F. Supp. 2d 695, 701

(N.D. Tex. 2007).

Plaintiffs' initial complaint was filed on December 14, 2006.  Accordingly, claims with

respect to options granted before December 14, 2001 are untimely.  Five of the twelve grants

identified in the SSAC were purportedly made prior to that date.  *See* SSAC ¶¶ 93-97 (identifying

grants made on June 15, 2000; August 15, 2000; October 18, 2000; April 3, 2001; and October 10,

2001).  Plaintiffs argue that claims based on such grants are not time-barred because they "may not

have actually been granted until some time within the statutory period."  Dkt. No. 157 at 49.

However, plaintiffs do not allege any facts suggesting that these grants were, in fact, made after

**United States District Court**
For the Northern District of California

December 14, 2001.  Absent such allegations, the § 10(b) claims based on those grants are dismissed

as time-barred.  *See, e.g.*, *In re Silicon Storage*, 2009 U.S. Dist. LEXIS 58705, at *13.[9]

### ii.        Material Omission or Misrepresentation

Plaintiffs contend that Finisar's SEC filings falsely indicated that the company accounted for

stock option grants in compliance with APB 25, that its compensation expenses and net income were

accurate, and that any stock option had an exercise price equal to its fair market value on the date of

the grant.  *See* SSAC ¶¶ 111-158; 185-218.  Plaintiffs further allege that each of the defendants

signed at least one such filing within the limitations period.  *See id*; *In re Zoran*, 511 F. Supp. 2d at

1011 ("Employees and directors who sign or prepare financial disclosures can be held liable for

misstatements and omissions therein.") (citing *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 n. 5

(9th Cir. 2000)).

Defendants argue that because Finisar's Stock Incentive Plans do not define the "effective

date" of the grant, the statement that options were priced at fair market value on the date of the grant

is not literally false.  The court disagrees.  The proxy statements clearly indicated that stock options

would provide value "only when the price of our Common Stock increases over the exercise price."

SSAC ¶ 111.  To the extent that options were granted in-the-money–and defendants do not dispute

that some options were–they were instantly valuable, and thus the proxy statements were at least

misleading, if not patently false.  *Compare SEC v. Shanahan*, 646 F.3d 536, 543 (8th Cir. 2011)

(finding no material misrepresentation where the stock option plans at issue did not explicitly

prohibit granting in-the-money options).  In addition, the statement in the Forms 10-K that Finisar

was in compliance with APB 25 was false and material, as evidenced by the company's admission in

its 2007 10-K that it had failed to comply with APB 25 and subsequent restatement of more than

$112 million in compensation expenses.  *See, e.g.*, *In re VeriSign, Inc., Derivative Litig.*, 531 F.

---

[9]        While pre-December 14, 2001 grants cannot form the basis for a § 10(b) claim, conduct
alleged to have occurred outside the period of repose may be used to support inferences regarding
conduct within the limitations period.  *In re Silicon Storage Tech. Inc.*, 2009 U.S. Dist. LEXIS
58705, at *14 ("While the Court will evaluate Plaintiffs' pleading of all of the alleged backdating in
order to provide a complete picture of Defendants' alleged misconduct, the allegations with respect
to all but the first of the timely-alleged grants are factually deficient, as discussed below."); *cf. In re
MRV Communs., Inc.*, No. 08-3800, 2010 U.S. Dist. LEXIS 46946, at *11 (C.D. Cal. May 10, 2010)
(considering allegations of backdating that occurred before plaintiffs acquired stock in determining
whether directors were disinterested).

Supp. 2d 1173, 1205 (N.D. Cal. 2007) ("In view of VeriSign's announcement of the anticipated restatement of its financial statements to account for backdated options, the court finds that plaintiffs need not allege additional facts to support their claim that defendants issued false or misleading financial statements."); *In re Silicon Storage*, 2009 U.S. Dist. LEXIS 58705, at *14 (restatement of $41 million was sufficient to show materiality). The court therefore finds that plaintiffs have adequately alleged that defendants made material misrepresentations.

### iii.    Scienter

Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, n. 12 (1976). A plaintiff may establish scienter "by showing that the defendants knew their statements were false, or ... were reckless as to the truth or falsity of their statements." *Gebhart v. SEC*, 595 F.3d 1034, 1041 (9th Cir. 2010). Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights*, *Ltd.*, 551 U.S. 308, 313 (2007). To determine whether plaintiffs have alleged facts giving rise to a "strong inference" of scienter, the court must consider both (1) plausible non-culpable explanations for defendants' conduct; and (2) inferences favoring the plaintiffs. *See id* at 324. Evidence of scienter must be more than merely "reasonable" or "permissible"; it must be "cogent" and "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* Further, plaintiffs must plead scienter on an individualized, defendant-by-defendant basis; "group pleading" is not permissible under the PSLRA. *In re Marvell Tech. Group Ltd. Secs. Litig.*, No. 06-06286 RMW, 2008 U.S. Dist. LEXIS 84934, at *14 (N.D. Cal. Sept. 29, 2008).

As a threshold matter, the parties emphatically dispute the impact of the remand order on this court's determination of whether defendants possessed the requisite state of mind. While the Court of Appeal did not expressly address the issue of scienter, it found that plaintiffs' allegations "indicated that the business judgment rule would not apply." *Lynch*, 429 Fed. Appx. at 644 (citing *Ryan*, 918 A.2d at 355). Plaintiffs argue that this language indicates that the Ninth Circuit determined that defendants, or at least a majority of the demand board, acted in bad faith. According to plaintiffs, the remand order thus establishes that scienter is adequately pled.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    On the other hand, defendants contend that the remand order has no bearing on whether

2    plaintiffs have sufficiently pleaded scienter under the PSLRA.  Defendants note that the Ninth

3    Circuit applied Delaware law, which requires only a "reasonable doubt" as to director

4    disinterestedness, *see Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), rather than the "strong

5    inference" of scienter needed to satisfy the federal standard.  Defendants also point out that the

6    Ninth Circuit specifically cautioned against "analyz[ing] the claims individually rather than

7    collectively" and "draw[ing] inferences in favor of defendants rather than plaintiffs," *Lynch*, 429

8    Fed. Appx. at 644, while the PSLRA requires an individualized, balanced analysis to find scienter.

9    *See Tellabs, Inc.*, 551 U.S. at 324.  Finally, defendants contend that the remand order considered

10   only the conduct of the demand board, which cannot be imputed to the remaining defendants.

11      The court finds that while the remand order does not conclusively determine that defendants

12   acted with scienter, it strongly suggests such a finding, at least as to a majority of the demand board.

13   Indeed, although there is a surprising dearth of authority concerning the relationship between

14   demand futility under Delaware law and scienter under Section 10(b), it is difficult to imagine a

15   scenario in which a board would not be subject to the broad protections of the business judgment

16   rule and yet *none* of its members would be found to have acted culpably.  *See In re RJR Nabisco,*

17   *Inc. Shareholders Litig.*, 1989 Del. Ch. LEXIS 9, at *14 n. 13 (Del. Ch. Jan. 31, 1989) (application

18   of the business judgment rule "really is a way of inferring bad faith").  In fact, defendants

19   themselves argue that the substantive and procedural standards for overcoming the business

20   judgment rule are similar to those at issue under Section 10(b).  *See* Dkt. No. 148 at 17; *see also In*

21   *re Goldman Sachs Group, Inc. S'holder Litig.*, No. 5215, 2011 Del. Ch. LEXIS 151, at *68 (Del. Ch.

22   Oct. 12, 2011) ("To act in bad faith, there must be scienter on the part of the defendant director.").

23   Moreover, although the Court of Appeal did not reference the PSLRA or federal pleading standards,

24   Delaware law requires "particularized facts" showing demand futility, a test not dissimilar from that

25   required under Rule 12(b)(6).  *Compare Aronson*, 473 A.2d at 814 *with Ashcroft v. Iqbal*, 129 S. Ct.

26   1937, 1949-50 (2009).  Nor did the Court of Appeal explicitly limit its holding to demand futility,

27   noting that  "plaintiffs' allegations should have been taken as true in the *motion to dismiss* context."

28   *Lynch*, 429 Fed. Appx. at 644 (emphasis added).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS SUPPLEMENTAL SECOND
AMENDED COMPLAINT—06-07660 RMW
EDM                                                                         15

1    The Delaware authority on which the Ninth Circuit relied also implies a finding of scienter.

2    In *Ryan v. Gifford*, the Delaware Court of Chancery noted that "backdating options qualifies as one

3    of those 'rare cases [in which] a transaction  may be *so egregious* on its face that board approval

4    cannot meet the test of business judgment.'" *Ryan*, 918 A.2d at 356-57 (quoting *Aronson*, 473 A.2d

5    at 815) (emphasis added).  The *Ryan* court also found that the business judgment rule was not

6    satisfied where, as here, directors were alleged to have acted in bad faith.  As the court explained:

> Plaintiffs allege the following conduct: Maxim's directors affirmatively represented to
> Maxim's shareholders that the exercise price of any option grant would be no less
> than 100% of the fair value of the shares, measured by the market price of the shares
> on the date the option is granted. Maxim shareholders, possessing an absolute right to
> rely on those assurances when determining whether to approve the plans, in fact
> relied upon those representations and approved the plans. Thereafter, Maxim's
> directors are alleged to have deliberately attempted to circumvent their duty to price
> the shares at no less than market value on the option grant dates by surreptitiously
> changing the dates on which the options were granted. To make matters worse, the
> directors allegedly failed to disclose this conduct to their shareholders, instead
> making false representations regarding the option dates in many of their public
> disclosures.
>
> I am unable to fathom a situation where the deliberate violation of a shareholder
> approved stock option plan and false disclosures, obviously intended to mislead
> shareholders into thinking that the directors complied honestly with the
> shareholder-approved option plan, is anything but an act of bad faith.  It certainly
> cannot be said to amount to faithful and devoted conduct of a loyal fiduciary.
> Well-pleaded allegations of such conduct are sufficient, in my opinion, to rebut the
> business judgment rule and to survive a motion to dismiss.

*Ryan*, 918 A.2d at 358.

    Given the substantial similarity between the allegations at issue in *Ryan* and those contained

in the SSAC, and the fact that the Ninth Circuit specifically highlighted many of these allegations in

reversing this court's order, it is reasonable to infer that the Court of Appeal found that the SSAC

sufficiently alleged that a majority of the demand board–which included defendants Rawls,

Ferguson, Fries, Levinson, Mitchell, Stephens, and Trempont–acted in bad faith.  It also suggests

that in light of the specific allegations at issue here, this court's previous methodological critique of

plaintiffs' assertions on a grant-by-grant basis may be proper on a motion for summary judgment, but

is inappropriate for purposes of considering the instant motion.  *See Lynch*, 429 Fed. Appx. at 644

(finding that this court should not have "resolved factual inconsistencies *without discovery*")

(emphasis added).

United States District Court
For the Northern District of California

However, the remand order did not make an express finding of scienter, nor did it draw conclusions as to the allegations against the *entire* demand board or the defendants who were not members of the demand board. *See id.* (noting that the SSAC's "alleged facts ... raised a reason to doubt the disinterestedness of most *or* all of the [demand] board") (emphasis added). Thus, it remains unclear *which* defendants acted with the requisite state of mind. *See In re Silicon Storage*, 2009 U.S. Dist. LEXIS 58705, at *33 ("Even when backdating is almost certain, claims against individual defendants must be dismissed unless the complaint provides adequate detail regarding their role and knowledge of the alleged backdating.") (internal citations and quotation marks omitted). Therefore, the court will consider the SSAC's allegations against each defendant in more detail.

### (I)    Rawls

Rawls was a director and CEO of Finisar throughout the relevant period, received at least 1.2 million options specifically identified as preceding sharp increases in stock price,[10] and signed Finisar's false Forms 10-K and SOX certifications. In addition, as the sole member of the Stock Plan Committee, he was exclusively responsible for approving a substantial portion of the grants that Finisar ultimately *admitted* required accounting revision. In fact, the investigation report openly acknowledged that the dates for two grants issued by Rawls were "selected retrospectively to capture a more favorable price." SSAC ¶ 229. As a board member, he also approved grants to himself and the other directors. *See* Investigation Report at 49 (noting that during the relevant period, "the full Board retained authority to approve grants to members of the Board of Directors"). While each such allegation alone does not establish that Rawls acted intentionally or recklessly, together they give rise to a strong inference of scienter. *See, e.g.*, *In re Zoran*, 511 F. Supp. 2d at 1013 (allegations that CEO had control over options-granting process and signed false SEC statements were sufficient to show scienter); *In re Juniper Networks, Inc. Secs. Litig.*, 542 F. Supp. 2d 1037, 1047 (N.D. Cal. 2008) ("Allegations that the defendant signed false financial documents, approved options grants, oversaw the options granting process, or was intimately involved in deciding when and to whom

---

[10]    Notably, defendants do not challenge plaintiffs' allegations regarding these grants or provide any explanation as to why their dates were selected.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS SUPPLEMENTAL SECOND AMENDED COMPLAINT—06-07660 RMW
EDM                                                                                         17

options would be granted may support a strong inference of scienter."); *In re Affymetrix Derivative Litig.*, No. 06-05353 JW, 2008 U.S. Dist. LEXIS 97245, at *22-23 (N.D. Cal. Oct. 24, 2008) ("While Defendant Schiffman is not alleged to have been a member of the Board, the sheer amount of allegedly backdated options he received–50,000 shares–also supports an inference that he either had knowledge, or was reckless in not knowing, that they were backdated."); *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1100 (9th Cir. 2011) ("Large GAAP and GAAS violations can play a role in finding scienter.").

Defendants argue that given the "complexity" of APB 25 and Rawls' lack of legal and accounting knowledge, it is more plausible that he signed the Forms 10-K and SOX certifications unaware that Finisar was misrepresenting its financial status. Dkt. No. 143 at 19. However, as the Ninth Circuit has noted, although "there are instances where the measurement date [under APB 25] can be ... complicated to measure, such as an option grant conditioned on some other event occurring," in general "the measurement date is the date the option is granted to the employee." *N.M. State Inv. Council*, 641 F.3d at 1096. Further, given that Rawls had sole responsibility for granting employee options, his purported ignorance of APB 25 provides further evidence of his recklessness.

Defendants also point out that Rawls is not alleged to have sold any of his allegedly backdated stock, and thus had no motive to engage in backdating. That Rawls has not yet profited from the alleged scheme does not prove an absence of motive; stock options are intended in large part to incentivize key employees who ostensibly increase revenues, and so Rawls would gain by granting backdated options even if he never exercised his own. Defendants also highlight the fact that the board initiated an internal investigation and found that the misreporting of grant dates resulted from "procedural deficiencies." Yet the remand order specifically called this determination into question, noting that its "self-serving, self-exonerating conclusion of no malfeasance" was not especially convincing, particularly given that the investigation was overseen by defendants themselves. *Lynch*, 429 Fed. Appx. at 643 n. 1. Finally, defendants argue that the SEC's decision not to pursue an action against Rawls or any other defendant shows a lack of culpable intent. Although SEC inaction may impact a court's finding of scienter, "SEC charges simply are not a

**United States District Court**
For the Northern District of California

1   prerequisite to pleading recklessness with regard to accounting and financial reporting violations."

2   *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 200 n.

3   5 (2d Cir. 2009). In sum, the court concludes that particularized allegations that Rawls personally

4   granted a substantial number of options that required restating, received a grant of over a million

5   backdated options, approved allegedly backdated grants to other directors, sat on the company's

6   board and was its CEO, and signed materially false SEC filings are sufficient to find he acted with

7   the requisite state of mind.

8                    **(II)      Levinson**

9          Levinson was Chairman of the Board throughout the relevant period and received two option

10  grants totaling 1.1 million shares specifically identified as preceding "sharp" increases in stock price.

11  He also signed Finisar's Forms 10-K from 2000 to 2006 and approved purportedly backdated grants

12  to Rawls and the other directors. In addition, he is alleged to have sold 12 million shares of Finisar

13  stock during the relevant period for proceeds of $98 million.

14         In challenging plaintiffs' allegations, defendants rely primarily on the argument that although

15  Levinson's option dates preceded increases in the stock price and yielded atypically high returns

16  under plaintiffs' Merrill Lynch analysis, there were nearby dates when the stock was at a lower price,

17  negating the inference that the dates were intentionally selected to achieve the largest profit. *See*

18  Dkt. No. 147 at 15. However, defendants provide no other explanation for why the dates of

19  Levinson's grants were chosen. Indeed, the fact that a defendant chooses one of the lowest exercise

20  prices but not *the* lowest exercise price might just as easily be evidence of a canny operator

21  attempting to disguise a backdating scheme. In light of the Ninth Circuit's ruling, the court therefore

22  finds that plaintiffs have sufficiently alleged that Levinson received intentionally backdated grants,

23  supporting a strong inference of scienter. *See In re Silicon Storage*, 2009 U.S. Dist. LEXIS 58705,

24  at *28 ("Well-pleaded allegations that Defendants knowingly received backdated options may

25  support a strong inference of scienter.").

26         Defendants also point out that "there is nothing unusual about a company founder, such as

27  Mr. Levinson, selling a portion of his holdings." Dkt. No. 147 at 21. It is true that the Ninth Circuit

28  has held that only "'unusual' or 'suspicious' stock sales by corporate insiders may constitute

**United States District Court**
For the Northern District of California

1  circumstantial evidence of scienter." *In Re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 986 (9th Cir.

2  1999).  However, when combined with the claim that Levinson both approved and received

3  backdated grants and signed false SEC filings, his sale of a significant amount of stock during the

4  relevant period supports the allegation that he acted with the requisite state of mind.

5  **(III)    Compensation and Audit Committee Members**

6  Where a complaint contains well-pleaded allegations showing that options were backdated, it

7  is easiest to establish scienter against members of the compensation committee, who "can be

8  reasonably expected to know the date of the options as well as the date on which they actually

9  approve a grant." *In re Affymetrix*, 2008 U.S. Dist. LEXIS 97245, at *18 (quoting *Ryan*, 918 A.2d at

10  355 n. 35).  While the inference is not as strong for members of the audit committee, the fact that

11  Finisar's charter required the committee to "review the integrity of the Company's financial reporting

12  processes, both internal and external" raises a substantial question about whether its members knew

13  or should have known about its option granting practices.  *See In re Asyst Techs., Inc. Derivative*

14  *Litig.*, No. 06-04669 EDL, 2008 U.S. Dist. LEXIS 96834, at *38-39 (N.D. Cal. Nov. 12, 2008)

15  ("Given that Defendants' respective positions on the ... Audit Committee ... would have given

16  Defendants detailed knowledge of when the options were actually granted, and given that the Court

17  has already found (in no small part because of the press release issued by [the company] itself) that

18  extensive backdating occurred, Plaintiff's FAC has adequately pled that Defendants would have

19  known or were deliberately reckless in not knowing about the backdated options.").  Nevertheless,

20  "committee membership, without more, falls far short of establishing that the directors acted with

21  scienter." *In re Silicon Storage*, 2009 U.S. Dist. LEXIS 58705, at *33-34.

22  During the relevant period, the Compensation Committee included defendants Child,

23  Ferguson, Mitchell, Fries and Stephens.  The Audit Committee included defendants Child, Ferguson,

24  Mitchell and Trempont.  In considering whether the SSAC sufficiently alleges scienter against each

25  committee member, the court draws a distinction between those who served on the board between

26  2000 and 2005, when most of the allegedly backdated grants were issued, and those who joined the

27  board in 2005.

28  **(A)    Committee members who joined the board in 2005**

United States District Court
For the Northern District of California

1    The court finds that plaintiffs have failed to adequately allege scienter with respect to

2    defendants Fries, Trempont and Stephens.  Each joined the board in the summer of 2005, nearly a

3    year after the last challenged officer grant was made in October 2004.  *See* SSAC ¶ 103.  Although

4    plaintiffs have challenged grants made to Trempont and Stephens themselves in 2005, those grants

5    were made on the day that their board memberships were *prospectively* deemed effective in a

6    judicially noticeable Form 8-K.  *See* Dkt. No. 147-2, Ex. 11.  As this court previously found, "both

7    the fact that the grant coincided with their joining the board and the fact that the date was announced

8    in advance weigh against an inference of backdating."  *In re Finisar Corp. Derivative Litig.*, No. 06-

9    07660 RMW, 2009 U.S. Dist. LEXIS 94002, at *32-33 (N.D. Cal. Sept. 22, 2009); *see also In re*

10   *CNET Networks, Inc.*, 483 F. Supp. 2d 947, 960 (N.D. Cal. 2007) ("Mere reliance on the numbers

11   alone is not sufficient when plaintiffs are confronted with a legitimate, judicially-noticeable

12   explanation for the grant date.").  Further, plaintiffs concede that the Forms 4 for those grants were

13   issued within two days, increasing the likelihood that the grant dates were legitimately selected.  The

14   SSAC also alleges that Fries was granted 50,000 options "during the relevant period," but does not

15   identify when such grants were made or why they are suspicious.  SSAC ¶ 50.  The court therefore

16   finds that plaintiffs have not sufficiently established that Trempont, Stephens or Fries received or

17   granted backdated options.

18       In addition, the SSAC does not show that Trempont, Stephens or Fries knowingly signed a

19   false SEC filing.  While Fries is alleged to have signed the 2005 Form 10-K, which would have

20   covered the October 2004 grant, he was a member of the Compensation Committee at that time, not

21   the Audit Committee, and had joined the board just one month before the statement was filed.  *See*

22   *id.*  Therefore, he was not necessarily in a position to know that the grant had been erroneously

23   recorded.  Trempont and Stephens signed the 2006 Form 10-K, but, as discussed above, because

24   there are insufficient allegations showing that any grants issued in 2005 were backdated, the 2006

25   disclosure did not contain any false statements.  Therefore, the court finds that plaintiffs have not

26   raised a strong inference that Fries, Trempont or Stephens "acted with the required state of mind."

27   *Tellabs, Inc.*, 551 U.S. at 313.

28               **(B)      Committee members who joined the board before 2005**

1    On the other hand, plaintiffs have adequately pled scienter with respect to defendants Child

2    and Ferguson.  First, plaintiffs point to a June 7, 2002 grant to Ferguson that preceded a sharp price

3    increase and allege that he sold 40,000 shares of Finisar stock during the relevant period for

4    proceeds of $431,833.[11]  *See* SSAC ¶¶ 49, 98.  Defendants again argue that Ferguson's grant was not

5    knowingly backdated because it was not attributed to a nearby date when Finisar's stock price was

6    lower.  *See, e.g.*, Dkt. No. 147 at 17.  However, as discussed above in regard to the grants made to

7    Levinson, under the circumstances here, the court finds this argument unpersuasive.

8    The court also finds that Child and Ferguson oversaw or approved a number of backdated

9    grants.[12]  Each sat on either the Audit or Compensation committee from April 2000 through April

10   2003 and both committees from April 2003 through April 2005.  While defendants explain the dates

11   chosen for some of the challenged grants issued during this period–for example, the April 29, 2003

12   grant to non-defendant Fariba Danesh, which corresponded with her hiring date–they continue to

13   rely almost entirely on the argument that the grants could have been more profitably backdated.  *See,*

14   *e.g.*, Dkt. No. 147 at 17, 18 n. 7.  Defendants also try to shift the blame for any alleged backdating to

15   Rawls, noting that most of the restated grants were issued by the "Stock Plan Committee."  Dkt. No.

16   147 at 2.  In light of the remand order, the reasons to doubt the credibility of the board's internal

17   investigation, the significant percentage of grants alleged to have been backdated and the large

18   number of grants which were *admitted* to have been misreported, the court does not find these

19   arguments availing.  Simply put, Child and Ferguson were responsible for granting options,

20   overseeing financials, or both during a period when plaintiffs have alleged that substantial

21   backdating occurred.  Ferguson is also plausibly alleged to have received a backdated grant himself.

22   The court therefore finds scienter adequately pleaded as to these defendants.

23                    **(IV)   Olsen**

24

25

26   [11]      Conversely, plaintiffs do not challenge specific grants issued to Child or Mitchell.

27   [12]      Even though conduct that occurred before December 14, 2001 falls outside the repose period,
     it may serve to demonstrate a pattern or likelihood that defendants were knowingly engaged in
28   backdating.  *See In re Silicon Storage Tech. Inc.*, 2009 U.S. Dist. LEXIS 58705, at *14; *In re MRV*
     *Communs., Inc.*, No. 08-3800, 2010 U.S. Dist. LEXIS 46946, at *11 (C.D. Cal. May 10, 2010).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS SUPPLEMENTAL SECOND
AMENDED COMPLAINT—06-07660 RMW
EDM                                                         22

United States District Court
For the Northern District of California

1    With respect to Olsen, the court concludes that plaintiffs have failed to establish scienter.

2    Olsen was a director from 2000 to 2002, and received a grant of 300,000 options on October 18,

3    2000, the same day Finisar announced its acquisition of Sensors Unlimited, Inc., a company Olsen

4    had founded.  As defendants point out, it is entirely plausible that the grant date was chosen to

5    coincide with the announcement of the acquisition, and that the subsequent rise in the stock price

6    resulted from the merger.  The court therefore declines to find that the pleadings show that Olsen

7    received any deliberately backdated grants.  Plaintiffs also allege that Olsen sold more than 2.7

8    million shares of Finisar stock in December 2000 for proceeds of over $78 million and signed SEC

9    filings in 2001 and 2002.  As discussed above, without more, neither fact is sufficient to establish

10   scienter.  *See In Re Silicon Graphics Sec. Litig.*, 183 F.3d at 986; *In re Silicon Storage*, 2009 U.S.

11   Dist. LEXIS 58705, at *35 (signing SEC statements does not establish that the director acted with

12   scienter).

13              **(V)    Workman**

14   Workman, the only remaining officer defendant, was Finisar's CFO throughout the relevant

15   period, received specifically identified grants of 365,000 options in 2000, 2001, and 2002–one of

16   which was issued at the eighth lowest closing price for the year–and signed both Finisar's Forms 10-

17   K and its proxy statements.  In addition, Workman allegedly sold shares of Finisar stock during the

18   relevant period for proceeds of more than $3.5 million.  Defendants do not directly challenge

19   plaintiffs' assertion that Workman received backdated options.  Rather, they argue that "not having

20   made any stock option grants himself," it is more likely that Workman signed SEC filings that he

21   erroneously believed were accurate.  Dkt. No. 148 at 12.

22   Although the "mere fact of a particular defendant's position" is insufficient to impose

23   liability, *In re VeriSign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1207 (N.D. Cal. 2007),

24   plaintiffs have adequately pled that Workman either knew or should have known about the alleged

25   backdating.  Unlike the defendants in *VeriSign*, on which defendants rely, Workman is specifically

26   alleged to have received a substantial number of backdated options himself.  Further, *VeriSign* is

27   distinguishable because there, the court determined that demand was not futile. By contrast, the

28   Ninth Circuit has already found demand futility and, by implication, that backdating occurred on

United States District Court
For the Northern District of California

1    Workman's watch.  *Compare id.* at 1202.  In addition, given Workman's responsibility as CFO

2    during a period when it is established that backdating occurred, he was in a "unique position" to

3    know about the scheme.  SSAC ¶ 44; *see also Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F.

4    Supp. 2d 1164, 1183 (C.D. Cal. 2007) (finding that because defendant's position as CFO would have

5    offered "detailed knowledge of when the options were actually granted, and given that the Court has

6    already found ... that extensive backdating occurred, Plaintiff's FAC has adequately pled that

7    Defendant[] would have known or w[as]  deliberately reckless in not knowing about the backdated

8    options.").  Accordingly, the court concludes that plaintiffs' have sufficiently pleaded scienter with

9    respect to Workman.

10          In sum, the court finds that plaintiffs' pleadings sufficiently show that defendants Rawls,

11   Levinson, Child, Ferguson, and Workman acted with the requisite state of mind.  Plaintiffs have

12   failed to adequately allege scienter as to defendants Fries, Trempont, Stephens and Olsen.

13                       **iii.       Reliance and Causation**

14          Defendants also argue that plaintiffs' claim must be dismissed because there are no

15   allegations that Finisar itself relied on any misstatement to its detriment.  As noted above, plaintiffs

16   allege that Finisar relied on defendants' misrepresentations in making "in-the-money" stock-option

17   grants to officers and directors, and suffered harm because those options should have fetched a

18   higher price, the scheme subjected the company to investigative costs and potential liability,

19   damaged its credibility, resulted in its stock fetching a lower price and forced the restatement of

20   $112 million in compensation costs.  *See* SSAC ¶ 9.  Similar allegations have been found sufficient

21   to show reliance and causation in derivative suits involving backdating.  *See, e.g.*, *In re Zoran*, 511

22   F. Supp. 2d at 1012; *In re Silicon Storage*, 2009 U.S. Dist. LEXIS 58705, at * 35 n. 11; *In re Maxim*

23   *Integrated Prods.*, 574 F. Supp. 2d 1046, 1064-66 (N.D. Cal. 2008).

24          Defendants respond that reliance and causation cannot be shown because plaintiffs have not

25   demonstrated that Finisar itself was actually deceived.  Dkt. No. 163 at 5.  Defendants again rely on

26   *VeriSign*, which dismissed derivative claims under Section 10(b) because plaintiffs failed to

27   "identify a single [company] officer or director who relied on the supposedly false or misleading

28   financial statements in deciding to undertake the stock repurchase on [the company's] behalf."  *In re*

1   *VeriSign*, 531 F. Supp. 2d at 1209.  In essence, defendants' argument is that defendants *are* Finisar;

2   therefore, Finisar knew the financial statements were misleading (because defendants caused them to

3   be), and could not have been deceived by those statements in issuing or repurchasing stock.  As the

4   *VeriSign* court put it, "reliance cannot be established when the individual allegedly acting on a

5   misrepresentation 'already possesses information sufficient to call the representations into question.'"

6   *Id.* (quoting *Atari Corp. v. Ernst & Whinney*, 981 F.2d 1025, 1030 (9th Cir. 1992)).

7        At the outset, the court questions *VeriSign*'s holding insofar as it requires dismissal of a fraud

8   claim where *all* of the directors are in on the scheme, but allows the claim to proceed if the

9   corruption is less widespread.  *See In re VeriSign*, 531 F. Supp. 2d at 1209 ("Plaintiffs might be able

10  to plead reliance if they were to allege that the corporate decision-maker for the repurchase of shares

11  had no knowledge of the alleged fraud.").  Further, *Atari Corp.*, on which *VeriSign* relied, has little

12  relevance here because it concerned an action brought by an acquiring company against the

13  accountants and directors of a target company based on alleged deficiencies in the target's financial

14  statements.  The Ninth Circuit found that reliance on such statements was unjustified where the

15  purchaser "closes his eyes to a known risk."  *Atari Corp.*, 981 F.2d at 1030.  By contrast, if Finisar

16  issues or purchases stock at a loss, it does not do so recklessly–it is a puppet whose strings are pulled

17  by the very directors and officers responsible for the fraud.  In that sense, the *Verisign* court

18  "extended too far the legal fiction that the company is the same as its leadership." *In re Fossil, Inc.*,

19  713 F. Supp. 2d 644, 653 (N.D. Tex. 2010) (denying a motion to dismiss a 10(b) claim and rejecting

20  *Verisign*).  It is thus not surprising that defendants have failed to cite any cases following *Verisign*

21  under circumstances similar to those at issue here.  *See In re MRV Communs. Derivative Litig.*, No.

22  08-03800, 2010 U.S. Dist. LEXIS 136744, at *30-31 (C.D. Cal. Dec. 27, 2010) (declining to follow

23  *Verisign*); *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1073 (C.D. Cal.

24  2008) (rejecting *Verisign* and noting that "reliance is only foreclosed when the shareholders, not

25  only the officers and directors, are involved in the alleged fraud"); *compare In re Brocade*

26  *Communs. Sys. Derivative Litig.*, 615 F. Supp. 2d 1018, 1045 (N.D. Cal. 2009) (following *Verisign*

27  where alleged misstatements were contained in internal company documentation, not public filings).

28

United States District Court
For the Northern District of California

The court therefore declines to follow *Verisign* and finds that plaintiffs have sufficiently pled causation and reliance under Section 10(b).

Accordingly, the court denies the motion to dismiss plaintiffs' Section 10(b) claims as to defendants Rawls, Levinson, Child, Ferguson, and Workman but grants the motion as to defendants Fries, Trempont, Stephens and Olsen without prejudice.

### 2. Section 14(a) claims

Section 14(a) of the Exchange Act makes it unlawful to solicit a proxy "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78n(a).  To state a claim under § 14(a), a plaintiff must allege sufficient facts showing: "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction."  *N.Y. City Employees' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1022 (9th Cir. 2010) (citations omitted).  Injury for the purposes of § 14(a) requires "actual economic harm."  *Id.* at 1023.  Section 14(a) claims are subject to a three-year statute of repose.  *In re Zoran Corp.*, 511 F. Supp. 2d at 1017.

The essence of plaintiffs' Section 14(a) claim is that director defendants used the falsified proxy solicitations to maintain their positions on the board and, by extension, the "continuation of [their] unlawful stock option backdating scheme."  SSAC ¶ 259.  Plaintiffs allege that had shareholders known that the directors were granting themselves and others backdated options, they would not have voted to keep them on the board.  *Id.*  Plaintiffs also claim that defendants used the 2005 proxy statement, which promised that stock options would be granted at fair market value, to gain approval of the 2005 Stock Incentive Plan, which shareholders would have rejected had they known all the facts.  *Id.* ¶ 144.

Courts in this district have found similar allegations sufficient to state a claim under Section 14(a).  *See In re Zoran Corp.*, 511 F. Supp. 2d at 1017; *In re Maxim Integrated Prods.*, 574 F. Supp. 2d at 1066.  However, both cases are distinguishable from the instant action.  Under the statute of repose, the only proxy statements in play are those issued between 2004 and 2006.  As discussed

**United States District Court**
For the Northern District of California

above, because defendants offered legitimate explanations for the challenged grants issued in 2005,

the lone questionable grant issued during that time is the October 29, 2004 grant to officer Young.

*See* SSAC ¶ 103.  In theory, had shareholders been given the opportunity to elect board members or

approve that grant in the 2004 proxy statement, plaintiffs might be able to claim the resulting

economic loss.  However, as plaintiffs make clear, only the 2005 and 2006 proxy solicitations

sought the re-election of directors or the approval of stock plans.  *See* Dkt. No. 157 at 39; *compare*

*In re Maxim Integrated Prods.*, 574 F. Supp. 2d at 1066 (citing allegations that the proxy statements

at issue "concerned the election of directors and the approval of stock plans"); *In re Zoran Corp.*,

511 F. Supp. 2d at 1017 ("Shareholders allegedly kept voting for the board members in blissful

ignorance of the scheme to grant insiders backdated options while shortchanging the company.

Shareholders also authorized the stock-option plans under which the allegedly-backdated options

were granted.).  As plaintiffs have not identified any backdated grants made *after* the distribution of

a proxy statement that would have given shareholders an opportunity to prevent such misconduct,

they have failed to plead the "essential link" between a proxy misstatement and economic loss

suffered by Finisar.  *N.Y. City Employees' Ret. Sys.*, 593 F.3d at 1022; *see also In re iBasis, Inc.*

*Derivative Litig.*, 532 F. Supp. 2d 214, 223 (D. Mass. 2007) (dismissing 14(a) claim where plaintiffs

failed to allege "manipulated stock option grants that post-date the ... proxy statement [at issue]").

Accordingly, plaintiffs' claim under Section 14(a) is dismissed.  Because it is possible that

plaintiffs may be able to allege additional facts regarding the 2004 proxy statement that would

sustain a claim, dismissal is without prejudice.

**3.     Section 20(a) Claims**

In order to prove a prima facie case under § 20(a), plaintiff must prove: (1) a primary

violation of federal securities laws; and (2) that the defendant exercised actual power or control over

the primary violator.  *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

As discussed above, plaintiffs have adequately pleaded a violation of Section 10(b) against

certain defendants.  However, plaintiffs' claim fails because it is premised on the allegation that the

"primary violator" over which defendants exercised control is Finisar itself.  *See* SSAC ¶ 262.  As

this is a derivative action, Finisar is also the entity on whose behalf the suit is brought.  "It is

United States District Court
For the Northern District of California

1   logically impossible for a corporation on whose behalf a derivative action is brought to also be a

2   primary violator." *In re VeriSign*, 531 F. Supp. 2d at 1213; *see also In re Maxim Integrated Prods.*,

3   574 F. Supp. 2d at 1067 ("Since this is a derivative action, the company cannot be the primary

4   violator.").  As long as this remains a derivative action, plaintiffs' Section 20(a) claim must be

5   dismissed with prejudice.[13]

6   **B.      STATE LAW CLAIMS**

7          **1.      Breach of Fiduciary Duty**

8          Plaintiffs argue that defendants breached their fiduciary duties by: (1) receiving and

9   approving backdated options; and (2) disseminating false and misleading filings to the SEC and

10  proxy statements to shareholders.  The parties agree that Delaware law controls plaintiffs' fiduciary

11  duty claims.

12          A defendant who owes a duty of care or loyalty to a corporation breaches that duty where he

13  or she "acts intentionally, in bad faith, or for personal gain." *Ryan*, 918 A.2d at 357.  Further,

14  corporate charters may not confer immunity for acts taken in bad faith or breaches of the duty of

15  loyalty.  *See* 8 Del. Code § 102(b)(7); *In re Walt Disney Co. Derivative Litigation*, 906 A.2d 27, 65

16  (Del. 2006).  "Intentional violation of a shareholder approved stock option plan, coupled with

17  fraudulent disclosures regarding the directors' purported compliance with the plan, constitutes

18  conduct that is disloyal to the corporation and is therefore an act in bad faith." *Ryan*, 918 A.2d at

19  358.  Therefore, under Delaware law, where an officer or director knowingly engages in backdating

20  and the filing of false SEC statements, he or she is personally liable for breach of fiduciary duty.

21          As discussed above, the court finds that plaintiffs have sufficiently alleged that only

22  defendants Rawls, Levinson, Child, Ferguson and Workman knowingly received and/or granted

23  backdated options and signed fraudulent financial disclosures.  Accordingly, the court denies the

24  motion to dismiss fiduciary duty claims against those defendants, but grants the motion to dismiss

25  such claims against defendants Fries, Trempont, Stephens and Olsen without prejudice.

26  _____

27  [13]      The cases cited by plaintiff to refute this point are inapposite because they concern direct,
    rather than derivative actions.  *See In re Hayes Lemmerz Int'l, Inc. Equity Secs. Litig.*, 271 F. Supp.
28  2d 1007, 1022 n. 11 (E.D. Mich. 2003); In re CitiSource, Inc. Sec. Litigation, 694 F. Supp. 1069,
    1077 (S.D.N.Y. 1988); *Elliott Graphics, Inc. v. Stein*, 660 F. Supp. 378, 381 (N.D. Ill. 1987).

United States District Court
For the Northern District of California

1

2.      **Insider Trading under Delaware and California Law**

2      To state a claim for insider trading under Delaware law, plaintiff must plead that "(1) the

3   corporate fiduciary possessed material, nonpublic company information; and (2) the corporate

4   fiduciary used that information improperly by making trades because she was motivated, wholly or

5   in part, by the substance of that information." *In re Oracle Corp. Deriv. Litig.*, 867 A.2d 904, 934

6   (Del. Ch. 2004).  California law prohibits corporate insiders from selling or purchasing stock if they

7   have knowledge of material, nonpublic information.  *See* Cal. Corp. Code § 25402.  Because insider

8   trading is a fraudulent practice, a plaintiff must allege with particularity the facts supporting an

9   insider trading claim.  *See In re VeriSign, Inc., Derivative Litig.*, 531 F. Supp. 2d at 1221; *Guttman*

10  *v. Jen-Hsun Huang*, 823 A.2d 492, 497 (Del. Ch. 2003).

11     Plaintiffs allege that the "insider selling" defendants–Workman, Levinson, Ferguson, Child

12  and Olsen–had nonpublic knowledge that Finisar was overstating its net revenue by understating its

13  compensation expenses, and that their sales of Finisar stock were therefore illegal.  The SSAC, as

14  discussed above, sufficiently alleges that each defendant except Olsen knew or should have known

15  about the backdating scheme.  Relying on *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F.

16  Supp. 2d 1044, 1079 (C.D. Cal. 2008), defendants first argue that plaintiffs must show "actual

17  knowledge" to sustain an insider trading claim, rather than simply meeting the knowledge *or*

18  deliberate recklessness standard required to establish scienter under the PSLRA.  *Countrywide* is

19  factually distinguishable from the present case because it concerned corporate underwriting

20  practices, not backdating.  Further, *Countrywide* cited no authority or reasoning to support its

21  holding, and its stringent *mens rea* requirement has not been adopted by other courts.  Thus, to the

22  extent that *Countrywide* sets a higher standard for state law insider trading claims than the PSLRA

23  does for federal securities claims, the court declines to adopt its holding under these circumstances.

24  Finally, as plaintiffs do allege "actual knowledge" in support of their insider trading claims, *see*

25  SSAC ¶ 305, *Countrywide* does not insulate defendants from liability.

26     Defendants next argue that the insider trading claims must fail because plaintiffs do not

27  specifically allege "which sales were made when defendants were in possession of which inside

28  information."  Dkt. No. 147 at 22 n. 10 (quoting *In re VeriSign*, 531 F. Supp. 2d at 1221).  It is true

that plaintiffs do not identify individual transactions, instead alleging the total number of shares sold

by each defendant "during the relevant period."  However, similar allegations have been found

sufficient to sustain insider trading claims where plaintiffs have adequately alleged knowledge of

backdating.  *See In re Zoran*, 511 F. Supp. 2d at 1018*; compare In re VeriSign*, 531 F. Supp. 2d at

1221 (dismissing insider trading claims where plaintiffs failed to show scienter).  As the *Zoran*

court explained:

> [P]laintiff alleges that the insider defendants sold stock in certain amounts over a
> nine-year period.  It can be assumed ... that ... defendants knew that they were getting
> a great deal not available to the public and shareholders.  If they knew the stock
> options were backdated, then they knew that the options in effect were granted
> in-the-money.  They also knew that for all the relevant years that backdating was
> occurring at Zoran, the company's stated earnings were higher than its true earnings.
> That is, the company was not quite so robust as it appeared to the public.

*In re Zoran*, 511 F. Supp. 2d at 1018.  *In re Zoran*'s reasoning is persuasive.  Accordingly, the court

grants the motion to dismiss insider trading claims against Olsen, but denies the motion as to

Workman, Levinson, Ferguson and Child.

### 3.  Breach of Contract

Plaintiffs' contract claim is premised on the allegation that defendants Rawls, Ferguson,

Levinson, Stephens, Trempont, Workman and Olsen received stock options which were issued in

violation of Finisar's stock option plans.  *See* SSAC ¶ 300; Dkt. No. 155 at 47.  "In order to

successfully plead a breach of contract, . . . the aggrieved party must allege the making of the

contract, the obligation thereby assumed, and the breach."  *Goodrich v. E.F. Hutton Group, Inc.*, 542

A.2d 1200, 1203-04 (Del. Ch. 1988).  "Merely pleading that a breach of contract occurred, without

alleging the existence of a contract, is not sufficient to state a valid claim."  *Id.* at 1204.

Here, plaintiffs do not plead that the stock option plans are contracts.  Nor do they explain

which, if any, defendant entered into a binding contract incorporating the plan terms.  *Compare In re*

*Atmel Corp. Derivative Litig.*, No. 06-4592 JF, 2008 U.S. Dist. LEXIS 91909, at *38-39 (N.D. Cal.

June 25, 2008) (sustaining a claim for breach of contract where the complaint expressly alleged that

when specific defendants "received backdated stock opinions [they] entered into ... contracts with

[the corporation]").  Accordingly, the court grants the motion to dismiss plaintiffs' contract claim

with leave to amend.

**United States District Court**
For the Northern District of California

4.      **Corporate Waste**

In order to state a claim for corporate waste, a plaintiff must allege facts showing that a defendant "authorize[d] an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *Glazer v. Zapata Corp.*, 658 A.2d 176, 183 (Del. Ch. 1993).  Because the issuance of backdated options benefits the recipient at the expense of the corporation and its shareholders, a fiduciary who knowingly grants backdated options is liable for corporate waste.  *See In re Atmel*, 2008 U.S. Dist. LEXIS 91909, at *38.  On the other hand, the "mere recipients" of backdated options do not commit corporate waste because they did not "authorize" a one-sided exchange.  *Id.*

Here, the SSAC plausibly alleges that director defendants Rawls, Levinson, Child and Ferguson knowingly authorized backdated option grants to directors.  Further, Rawls and the Compensation Committee members, including Child and Ferguson, purportedly granted backdated options to employees and officers.  Thus, the court denies the motions to dismiss plaintiffs' corporate waste claim against Rawls, Levinson, Child and Ferguson.

On the other hand, because plaintiffs have not shown that director defendants Fries, Trempont, Stephens and Olsen knowingly issued backdated grants, and because Workman is not alleged to have granted any options at all, their motions to dismiss this claim are granted without prejudice.

5.      **Unjust Enrichment**

The elements of a claim for unjust enrichment are: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 585 (Del. Ch. 1998).  Even if a defendant has not exercised a backdated option, a claim for unjust enrichment may lie because the court can "rely on expert testimony to determine the true value of the option grants or simply rescind them." *Ryan*, 918 A.2d at 361.  Further, "a defendant may be liable even when the defendant retaining the benefit is not a wrongdoer and even though he may have received it honestly in the first instance." *Id.*

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS SUPPLEMENTAL SECOND AMENDED COMPLAINT—06-07660 RMW
EDM

1    Defendants argue that an unjust enrichment claim is untenable because the options at issue

2  were granted pursuant to an express contract.  This argument is unpersuasive, since, as noted above,

3  plaintiffs' breach of contract claim has been dismissed.  *See Bakerman v. Sidney Frank Importing*

4  *Co.*, 2006 Del. Ch. LEXIS 180 (Del. Ch. Oct. 10, 2006) ("Claims of unjust enrichment may survive

5  a motion to dismiss when the validity of the contract is in doubt or uncertain.").  The motions to

6  dismiss unjust enrichment claims against Rawls, Levinson, Ferguson, and Workman, each of

7  whom–as discussed in Section (A)(1)(iii) above–is plausibly alleged to have received backdated

8  options, are denied.[14]

9    **6.    Abuse of Control, Gross Mismanagement, and Constructive Fraud**

10    Claims for abuse of control, gross mismanagement, and constructive fraud "are often

11  considered a repackaging of claims for breach of fiduciary duties."  *In re Zoran.*, 511 F. Supp. 2d at

12  1019 (citing *Clark v. Lacy*, 376 F.3d 682, 686-87 (7th Cir. 2004)); *see also In re Atmel*, 2008 U.S.

13  Dist. LEXIS 91909, at *36-37.  As the court has sustained plaintiffs' fiduciary duty claim, these

14  claims are superfluous.  Accordingly, they are dismissed with prejudice.

15    **7.    Accounting and Rescission**

16    An accounting is an equitable remedy that may be applied between fiduciaries to "determine

17  the extent of a misallocation of expenses and the damages resulting therefrom."  *Carlson v.*

18  *Hallinan*, 925 A.2d 506, 538 n. 211 (Del. Ch. 2006).  Since officers and directors are fiduciaries of a

19  corporation, they may be required to account for their stewardship over corporate property.

20  *McMahon v. New Castle Associates*, 532 A.2d 601, 604-605 (Del. Ch. 1987).  Likewise, rescission

21  is an equitable remedy that allows the court to cancel or annul an "instrument, document, obligation

22  or other matter affecting plaintiff's rights and/or liabilities."  *Alejandro v. Hornung*, 1992 Del. Ch.

23  LEXIS 188, 8-9 (Del. Ch. Aug. 12, 1992).

24

25  _____

26  [14]    Defendants argue on reply that any claim against Rawls must be rejected because his
    unexercised options had a 10-year lifespan and therefore expired on June 7, 2012, leaving Rawls
    without any possibility of being unjustly enriched.  *See* Dkt. No. 164 at 14.  Even if this is true,

27  defendants ignore Rawls' alleged August 27, 2003 grant, which would not expire until August 27,
    2013.  Furthermore, the court will not consider this argument on a motion to dismiss because it was

28  raised for first time in a reply brief.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (A
    "district court need not consider arguments raised for the first time in a reply brief.").

Defendants argue that because accounting and rescission are remedies, not causes of action, they must be dismissed. Plaintiffs essentially concede as much, but argue that it is inconsequential whether these claims are pled as causes of action or remedies. The court finds that while each remedy may ultimately be appropriate, these causes of action are better included in plaintiffs' prayer for relief. The court thus grants the motion to dismiss these claims with leave to amend. *See In re Zoran*, 511 F. Supp. 2d at 1019 (dismissing rescission claim); *In re Atmel Corp. Derivative Litig.*, No. 06-4592 JF, 2007 U.S. Dist. LEXIS 54058, at *30 (N.D. Cal. July 16, 2007) (granting leave to amend complaint to include accounting and rescission as remedies rather than claims).

### III. ORDER

For the foregoing reasons, the court orders as follows:

(1) The motions to dismiss plaintiffs' Section 10(b) claims as to defendants Rawls, Levinson, Child, Ferguson and Workman are denied. The motions to dismiss Section 10(b) claims against defendants Fries, Trempont, Stephens and Olsen are granted without prejudice.

(2) The motions to dismiss plaintiffs' Section 14(a) claims are granted without prejudice.

(3) The motions to dismiss plaintiffs' Section 20(a) claims are granted with prejudice.

(4) The motions to dismiss plaintiffs' breach of fiduciary duty claims as to defendants Rawls, Levinson, Child, Ferguson, and Workman are denied. The motions to dismiss such claims against defendants Fries, Trempont, Stephens and Olsen are granted without prejudice.

(5) The motions to dismiss insider trading claims under Delaware and California law are denied as to defendants Workman, Levinson, Ferguson and Child, but granted without prejudice as to defendant Olsen.

(6) The motions to dismiss plaintiffs' claims for breach of contract are granted without prejudice.

(7) The motions to dismiss plaintiffs' claims for corporate waste are denied as to defendants Rawls, Levinson, Child and Ferguson, but granted without prejudice as to defendants Fries, Trempont, Stephens, Olsen and Workman.

(8) The motions to dismiss plaintiffs' claims for unjust enrichment are denied as to defendants Rawls, Levinson, Ferguson, and Workman, but granted without prejudice as to defendants Fries, Trempont, Stephens, Olsen and Child.

(9) The motions to dismiss plaintiffs' claims for abuse of control, gross mismanagement and constructive fraud are granted with prejudice.

(10) The motions to dismiss plaintiffs' claims for accounting and rescission are granted without prejudice.

Any amended pleading must be filed within 30 days of the date of this order.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    DATED:          July 12, 2012                                    _Ronald M. Whyte_

2                                                                RONALD M. WHYTE

3                                                                United States District Judge

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS SUPPLEMENTAL SECOND
AMENDED COMPLAINT—06-07660 RMW
EDM                                                        34